VANCE, n.k.a. Smith, Appellee,

v.

VANCE; Vance, Appellant.

[Cite as *Vance v. Vance,* 151 Ohio App.3d 391, 2003-Ohio-310.]

Court of Appeals of Ohio,
Second District, Montgomery County.

No. 19381.

Decided Jan. 24, 2003.

392

Terry W. Posey, for appellee, Margaret Vance.

Paul D. Gilbert, for appellant, Bonnie Vance.

FREDERICK N. YOUNG, Judge.

{¶ 1}   Bonnie M. Vance, third-party defendant-appellant (hereinafter the parties will be referred to by their first names to avoid confusion) is appealing a decision and judgment of the Domestic Relations Division of the Montgomery County Court of Common Pleas, overruling her objections to the magistrate's decision and permanent order.  The trial court's decision designated the plaintiff-appellee, Margaret Vance, n.k.a. Smith, as the residential parent and legal custodian of her son, the minor child Michael Vance.  Additionally, the order continued supervised visitation at Erma's House with Bonnie, Michael's paternal grandmother, and the defendant, Joshua Vance, Michael's father, at one hour per week.

{¶ 2}   Margaret and Joshua were married on January 30, 1998, and divorced on December 28, 1999.  Michael was the only child born as issue of the marriage.  At the time of the divorce, the trial court granted the parties shared parenting, and Margaret was designated as Michael's residential parent for school purposes.

{¶ 3}   In May 2000, Joshua exercised a two-week period of parenting time with Michael.  Instead of returning Michael to Margaret, Bonnie, as a third-party defendant, filed a motion for ex parte temporary custody of Michael on May 15, 2000.  The magistrate granted the entry that same day.  On May 30, 2000, Margaret filed a motion for emergency hearing on the ex parte temporary custody order, a motion to terminate the shared parenting plan, a motion for contempt for denial of parenting time, a motion for contempt for Joshua's failure to pay child support, a motion to strike a false pleading, and a motion for Joshua to have supervised parenting time.  A hearing was held on the matters, and on June 13, 2000, the magistrate vacated the ex parte temporary custody order, finding no evidence that Margaret had caused injury or harm to Michael.  The issues of custody and visitation were set for further hearings.

{¶ 4}   Bonnie filed objections to the magistrate's decision on June 20, 2000, along with a motion for reconsideration, a motion for a hearing, and a motion for a new hearing.  On that same day, Margaret filed a motion for contempt for Bonnie's and Joshua's failure to comply with the magistrate's order to return Michael.  The magistrate filed an entry granting Bonnie an extension of time in

which to file supplemental objections; however, a temporary entry ordering the parties to comply with the June 13, 2000 order was also issued at that time.

{¶ 5} Bonnie filed a notice of appeal with this court on July 28, 2000, requesting a stay of the order vacating temporary custody. This court denied Bonnie's appeal. Bonnie filed her objections to the magistrate's decision with the trial court on August 24, 2000, and soon after filed a motion for full custody. The magistrate ruled favorably upon Margaret's motion for contempt for failure to return the child after visitation.

{¶ 6} The trial court overruled Bonnie's objections on October 10, 2000. That same day, the trial court filed an emergency entry granting physical custody of Michael to Margaret because Bonnie had failed to relinquish physical possession of Michael. Supervised parenting time was established for Bonnie and Joshua at one hour per week at Erma's House.

{¶ 7} Following hearings on the matter, the magistrate overruled Bonnie's request for custody on March 19, 2001. In his decision, the magistrate noted that Joshua had been served but had not appeared for the three hearings held on the matter. The magistrate designated Margaret as the sole residential custodian of Michael. Additionally, due to Bonnie's "lack of social judgment" and her unwillingness to return Michael to Margaret, combined with Joshua's being "so heavily influenced" by Bonnie, the magistrate continued the supervised parenting time.

{¶ 8} Bonnie filed objections to the magistrate's decision on March 28, 2001. The trial court overruled those objections on May 29, 2002. Bonnie filed her appeal with this court that day, asserting error in the trial court's determinations of custody and visitation.

{¶ 9} Preliminarily, we have previously described the deference that is to be accorded to a trial court in child custody disputes as follows:

{¶ 10} "The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. In this regard, the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct.

{¶ 11} "While a trial court's discretion in a custody modification proceeding is broad, it is not absolute, and must be guided by the language set forth in R.C. 3109.04. In addition, the trial court's determination in a custody proceeding is, of course, subject to reversal upon a showing of an abuse of discretion." (Citations omitted.) *Meyer v. Anderson* (Apr. 18, 1997), Miami App. No. 96CA32, 1997 WL 189383, citing *Miller v. Miller* (1988), 37 Ohio St.3d 71, 74, 523 N.E.2d 846.

{¶ 12} In *Meyer*, we further held that a trial court's custody determination will not be reversed absent an abuse of discretion as long as that decision is supported by competent and credible evidence. Furthermore, "[i]n determining whether a trial court has abused its discretion, we cannot simply substitute our judgment for that of the trial court.* * * Rather, an abuse of discretion indicates that the trial court's decision was arbitrary, unreasonable, or capricious." Id. (Citations omitted.)

### Bonnie's First Assignment of Error

{¶ 13} "The trial court committed error in failing to consider the testimony of the hearing of 6–10–00."

{¶ 14} Bonnie asserts that the trial court did not consider all of the evidence before it, in particular the testimony from the June 10, 2000 hearing.

{¶ 15} We disagree. The trial court's decision referred to all of the relevant motions and memoranda filed by the parties and also noted that "[t]he Court, in making this decision, has considered all the evidence admitted in this case. The Court reviewed the voluminous record and transcripts from the hearings on these motions."

{¶ 16} Accordingly, we overrule Bonnie's first assignment of error.

### Bonnie's Second Assignment of Error

{¶ 17} "The trial court misstates the holding from the case of *Esch v. Esch* [ (Feb. 23, 2001), Montgomery App. No. 18489, 2001 WL 173198] decided by this Court and demonstrated that it applied an improper standard in determining custody[.]"

{¶ 18} It is Bonnie's contention that the magistrate and the trial court misapplied the standard necessary for determining custody in this situation. We disagree and find that the correct standard was utilized.

{¶ 19} Under Ohio law, child custody disputes fall within the coverage of either R.C. 3109.04 or 2151.23. R.C. 3109.04 provides guidance to domestic relations courts for the allocation of parental rights and responsibilities between divorcing parents. R.C. 3109.04(D)(2) permits a domestic relations court, under certain circumstances, to award custody of a child of divorcing parents to a relative of the child other than one of the parents when it is in the best interest of that child. The other statute, R.C. 2151.23(A)(2), gives juvenile courts exclusive jurisdiction "to determine the custody of any child not a ward of another court of this state[.]"

{¶ 20} Generally, juvenile court custody disputes between parents and nonparents are governed by the Ohio Supreme Court's decision in *In re Perales*

(1977), 52 Ohio St.2d 89, 6 O.O.3d 293, 369 N.E.2d 1047. In *Perales*, Shirley Perales placed her newborn baby in the care of a nonrelative, and signed an agreement purporting to give custody to the nonrelative because she was afraid her husband would harm the baby. More than two years later, a dispute arose, and Perales filed a complaint for return of the child and for custody in the juvenile court. The court awarded custody of the child to the nonrelative based upon the best-interest-of-the-child test under R.C. 3109.04. Perales appealed, and the court of appeals found error in the trial court's failure to make a finding of "unsuitability" on behalf of Perales.

{¶ 21} The Supreme Court found that it was improper for the trial court to rely on R.C. 3109.04 because, under that section, the opposing parties are usually the child's parents, who both have a right to custody and who both stand on equal footing, and a finding of unsuitability would be inappropriate. Id. at 96, 6 O.O.3d 293, 369 N.E.2d 1047. Accordingly, in custody actions between parents, the best interest of the child should govern because "the welfare of the child would be the only consideration before the court." Id.

{¶ 22} However, in determining the standard in custody actions between a parent and a nonparent, the *Perales* court noted that " 'in all cases of controverted right to custody, the welfare of the minor is first to be considered,' but [the *Clark* court] also determined that parents who are 'suitable' persons have a 'paramount' right to the custody of their minor children unless they forfeit that right by contract, abandonment, or by becoming totally unable to care for and support those children." Id., 52 Ohio St.3d at 97, 6 O.O.3d 293, 369 N.E.2d 1047, quoting *Clark v. Bayer* (1877), 32 Ohio St. 299, 1877 WL 120, paragraphs one and two of the syllabus. Thus, the *Perales* court concluded that "[i]n an R.C. 2151.23(A)(2) child custody proceeding between a parent and a nonparent, the hearing officer may not award custody to the nonparent without first making a finding of parental unsuitability—that is, without first determining that a preponderance of the evidence shows that the parent abandoned the child, that the parent contractually relinquished custody of the child, that the parent has become totally incapable of supporting or caring for the child, or that an award of custody to the parent would be detrimental to the child." Id. at syllabus.

{¶ 23} This standard has not been regularly applied to custody disputes between a parent and a nonparent under R.C. 3109.04, and instead the best interests of the child test has traditionally been applied. However, in *Esch v. Esch* (Feb. 23, 2001), Montgomery App. No. 18489, 2001 WL 173198, this court found the best-interest standard in R.C. 3109.04 to be unconstitutional in a custody dispute between a parent and a nonparent given the United States Supreme Court's decision in *Troxel v. Granville* (2000), 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49. In *Troxel*, the Supreme Court found a Washington statute

unconstitutional because it violated the fundamental right of parents to rear their children. The Washington statute at issue permitted " 'any person' to petition a superior court for visitation rights 'at any time' " and authorized courts to grant visitation rights whenever the trial courts determined that such rights were in the best interests of the child. Id.; see, also, Washington Rev.Code 26.10.160(A).

{¶ 24} Because the *Troxel* court found it unconstitutional for a state court to infringe upon a parent's fundamental right to make child-rearing decisions by ordering visitation to a nonparent, we determined in *Esch* that a state court's grant of custody to a nonparent would unconstitutionally infringe upon a parent's right to make child-rearing decisions. For these reasons, we found R.C. 3109.04 to be unconstitutional and held that the standard to be used in determining custody between a nonparent and a parent is that established in *Perales,* supra.

{¶ 25} In this case, Bonnie is the grandparent, not the parent, of Michael. As a result, the trial court found that it would be in Michael's best interests to terminate the shared parenting arrangement. Moreover, in order for Bonnie to be awarded custody of Michael in this instance, rather than Margaret, Michael's mother, the trial court examined whether Michael's parents were unsuitable. For Bonnie to be awarded custody, the magistrate and the trial court would have had to determine by a preponderance of the evidence that Margaret and Joshua abandoned Michael, contractually relinquished custody, demonstrated a total inability to provide care or support for Michael, or were otherwise unsuitable, so that an award of custody would have been detrimental to Michael.

{¶ 26} Based upon the cited case law, we find that the magistrate and the trial court conducted an appropriate review of the situation utilizing the appropriate standard of law. We find no merit in this assignment of error.

## Bonnie's Third Assignment of Error

{¶ 27} "The trial court's erroneous conclusion that Appellant violated court orders requires, in and of itself, that custody be awarded to the Appellant.

{¶ 28} "Similarly, the trial court committed error in giving credibility to Dr. Bergman's testimony and her report since Dr. Bergman's conclusion that Appellant violated court orders was clearly erroneous."

{¶ 29} In the first part of this assignment of error, Bonnie contends that the trial court erred in concluding that she violated court orders and that she should therefore be awarded custody of Michael. Specifically, Bonnie contests Dr. Bergman's, the magistrate's, and the trial court's findings that Bonnie violated a court order in not returning Michael to Margaret's care. It is Bonnie's assertion that at no point was she under a court order directing her to "do anything."

{¶ 30} We disagree. In analyzing whether it would be in Michael's best interests to have the shared parenting plan terminated, the trial court stated the following:

█ {¶ 31} "Another factor to consider in the best interest of the child is which parent is more likely to honor and facilitate visitation and companion rights approved by the Court. The Court finds from a review of the record that an ex parte temporary custody order was filed May 15, 2000 granting temporary custody of the minor child to the third party defendant. Upon plaintiff's petition, the matter was reviewed and a Magistrate Decision and Permanent Order was filed June 13, 2000 vacating the temporary custody order. However, at that time defendant, Joshua, was residing with the third party defendant. In the face of that decision and subsequent denials of appeal by both the Montgomery County Court of Appeals and the Ohio Supreme Court on the matter of the third party defendant's petition to stay that order, the defendant and third party defendant steadfastly refused to return the child to plaintiff. It was not until October 13, 2000, after the Court filed its Decision and Judgment regarding the objections did the defendant return the minor child to the plaintiff. The Court views the behavior of the defendant as clear indicators that he would not honor or facilitate visitation or parental rights approved by this Court."

{¶ 32} Additionally, Dr. Bergman stated that Bonnie's failure to return Michael weighed in her recommendation that Margaret be designated residential parent and legal custodian and that Bonnie should continue to have supervised visitation at Erma's House.

{¶ 33} We find that Bonnie's refusal to return Michael to Margaret in accordance with the court order was evidence that it would not be in Michael's best interests for her to have custody and evidence that the shared parenting arrangement between Joshua and Margaret should be terminated. Contrary to Bonnie's contentions, there were several periods of time during the dates of May 15, 2000, to October 13, 2000, when Bonnie had physical custody in clear violation of the court order for Michael to be with Margaret.

█ {¶ 34} Regardless, even if the trial court erred in this determination, to award custody to Bonnie in this instance, where she is a nonparent, would first require the determination that Margaret is unsuitable, to which this evidence is irrelevant. Therefore, any resulting error would be harmless.

{¶ 35} Accordingly, we overrule Bonnie's third assignment of error.

### Bonnie's Fourth Assignment of Error

{¶ 36} "The trial court committed error in not awarding custody to Appellant since she is the child's primary caretaker and primary attachment figure."

{¶ 37} Bonnie claims that, because her witnesses in this case have opined that she is Michael's primary caretaker, and because it would be "harmful if the child were removed from her care," it was error for the trial court to disregard that evidence and to fail to award custody to her.

{¶ 38} In determining custody under R.C. 3109.04, one factor that warrants review in determining what is in a child's best interest is, although not specifically listed in R.C. 3109.04(F), the role of the child's primary caretaker because it "bears on the child's interaction and interrelationship with his parents, as well as the child's adjustment to his home." *In re Maxwell* (1982), 8 Ohio App.3d 302, 306, 8 OBR 409, 456 N.E.2d 1218. As this court stated in *Knox v. Knox* (Oct. 26, 1994), Champaign App. No. 94 CA 08, 1994 WL 590658, "we note that while the question of which parent has fulfilled the role of primary caretaker for young children is a very important consideration, it is by no means dispositive of the custody issue in and of itself." Instead, it is one of several relevant factors which must be considered by the court. Id.

{¶ 39} However, as we noted earlier, the standard in this case is not what is in Michael's best interests, but whether Margaret is a "suitable" parent under *Esch* and *Perales*. One factor to determine under the suitability standard is whether an award of custody to the parent would be detrimental to the child. *Perales*, supra, at syllabus. Bonnie now asserts that it would be detrimental for Michael to be removed from her care.

■ {¶ 40} In this case, the trial court considered the primary-caretaker doctrine as one of the factors in determining custody. In its May 29, 2002 judgment entry, the trial court found that "Michael is bonded to his mother and she is the primary caretaker for him." The trial court acknowledged that Bonnie had provided "significant care" for Michael throughout his life, and that Dr. Diane Frey had found Bonnie to be Michael's primary attachment figure and had opined that separation from her would cause lifelong harm to Michael. There also was testimony from Bonnie's professional clinical counselor, Amy Eiler, that removing Michael from Bonnie's care would be detrimental to Michael's psychological development.

{¶ 41} John Kinsel, a licensed practical clinical counselor for Good Samaritan, testified that he had seen Michael on several occasions in September 2000 while Michael was in Bonnie's care. He believed that Bonnie was Michael's primary attachment figure.

{¶ 42} The magistrate appointed Dr. Barbra Bergman to perform a custody evaluation. Dr. Bergman interviewed all of the parties involved and reviewed all of the reports written by the other professionals involved in this matter. Dr. Bergman concluded that Michael had significant developmental delays and that Michael's history was consistent with the history of an autistic child. Despite

Bonnie's continual assertion that Michael's developmental regression was primarily the result of his having been removed from her care, Dr. Bergman concluded that Michael's developmental disorder was not the result of any one traumatic event.

{¶ 43} In fact, Dr. Bergman found Bonnie to be one of the primary caretakers of Michael and concluded that there are significant risks in removing a child of Michael's age from his primary caretaker. Dr. Bergman noted, however, that she did not feel that children have only one primary attachment figure. According to Dr. Bergman, even if Bonnie were the primary attachment figure for Michael, he would be able to establish another primary attachment figure without significant trauma.

{¶ 44} Dr. Bergman did not recommend that Bonnie be awarded custody primarily due to her poor social judgment. Given the totality of the circumstances, Dr. Bergman recommended that Margaret be designated legal custodian and residential parent and that Bonnie and Joshua continue to have supervised parenting time through Erma's House.

{¶ 45} Dr. Michael Williams was hired by Bonnie to review Dr. Bergman's report and testimony. He testified that he wished that Dr. Bergman would have substantiated her conclusions more clearly. He noted the importance of primary attachment figures during the formative years and stated that during those years it is possible for a child to have more than one attachment figure.

{¶ 46} Given the conflicting testimony, the trial court determined that Margaret would not be an unsuitable parent and that the award of custody to Margaret would not be detrimental to Michael. There is evidence in the record supporting this conclusion. We must defer to the court's ability to assess the credibility of the witnesses. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 79–80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 47} Upon a review of the record, the court did, in fact, examine the primary-caretaker factor in relation to the *Esch* standard, and we find no abuse of discretion in its consideration.

{¶ 48} Bonnie's fourth assignment of error is overruled.

### Bonnie's Fifth Assignment of Error

{¶ 49} "The trial court committed error in failing to conclude that the magistrate improperly limited cross examination and that the magistrate committed other errors relating to the allowance or disallowance of testimony."

{¶ 50} Preliminarily, we note that the trial court has the discretion to limit the scope of cross-examination. *Berlinger v. Mt. Sinai Med. Ctr.* (1990), 68 Ohio App.3d 830, 838, 589 N.E.2d 1378. The trial court also has great latitude to

impose reasonable limits on cross-examination based upon the concerns of harassment, prejudice, confusion of the issues, or interrogation that is repetitive or only marginally relevant. *Delaware v. Van Arsdall* (1986), 475 U.S. 673, 679, 106 S.Ct. 1431, 89 L.Ed.2d 674. Therefore, a reviewing court should be slow to disturb a trial court's determination on the scope of cross-examination absent evidence that the trial court has abused its discretion. *Reinoehl v. Trinity Universal Ins. Co.* (1998), 130 Ohio App.3d 186, 194, 719 N.E.2d 1000. Furthermore, Evid.R. 611(B) affords that cross-examination shall be permitted on all relevant matters and matters affecting credibility.

{¶ 51} In her first issue within this assignment of error, Bonnie pinpoints 11 instances during her cross-examination of Dr. Bergman where the magistrate unfairly limited testimony and protected the witness from discredit and impeachment. We have reviewed all 11 incidents and find no error. Instead, we find that the magistrate properly limited the portions of Dr. Bergman's testimony which are in question, as they were either irrelevant or confusing. For these reasons, we overrule this portion of Bonnie's fifth assignment of error.

{¶ 52} Bonnie also asserts as error the "disallowance" of testimony by her counselor regarding the ultimate issue in the case, specifically, Eiler's opinion of whether it would be in Michael's best interests to remain in Bonnie's care. We see no error, as all of the cited lines of testimony were admitted. However, on the following page, the magistrate sustained an objection to a question posed to Eiler. The exchange occurred as follows:

{¶ 53} "Q. Do you have an opinion as to what would happen to him if he were removed from her care for any significant period of time, say, for more than a day or two?

{¶ 54} "MR. POSEY: Objection.

{¶ 55} "THE COURT: Do you have sufficient knowledge to even give us an opinion on that?

{¶ 56} "MS. EILER: The knowledge on that I would have would be prior behaviors that I saw when he was not in her care and the digression in behaviors.

{¶ 57} "THE COURT: I'm gonna sustain the objection then."

{¶ 58} Bonnie argues that this ruling violated Evid.R. 704.

{¶ 59} Evid.R. 704 provides that an expert's testimony "in the form of an opinion or inference otherwise admissible is not objectionable solely because it embraces an ultimate issue to be decided by the trier of fact."

{¶ 60} In reviewing the record, we note that the preceding portion of testimony involves Eiler testifying about Michael's development, her evaluation and

treatment plan for him, and Bonnie's actions to address his developmental issues. Eiler stated that in her opinion, it would be in Michael's best interests to remain in Bonnie's care. Additionally, there were other times during Eiler's cross-examination where she stated that it would be "damaging" to Michael to be separated from Bonnie. The following exchange occurred:

{¶ 61} "Q. Do you have an opinion as to whether it would be damaging to Mikey to be removed from Bonnie's care for a substantial period of time, say, two weeks, for example, in order for him to re-establish a relationship with his mother and then be tested with her after that period of time whether it would be damaging for that to take place?

{¶ 62} "MR. POSEY: Objection.

{¶ 63} "THE COURT: I'll allow that.

{¶ 64} "BY MR. GILBERT:

{¶ 65} "A. I think that it would be damaging to take Michael away from his primary attachment figure, which is Bonnie, for a two week period where—

{¶ 66} "MR. POSEY: Not responsive and also that clearly is beyond her scope.

{¶ 67} "THE COURT: I'll allow it to stand."

{¶ 68} Following this testimony, Eiler opined that it would be "damaging" for Michael to be taken away from his "primary attachment figure" and that he would most likely regress if removed from Bonnie's care for two weeks.

{¶ 69} Based upon this information, we find that any error caused by the magistrate's disallowing Eiler to answer this question would be harmless, as the issue had been discussed during other portions of Eiler's testimony. We thus overrule this portion of Bonnie's assignment of error.

{¶ 70} Similarly, the next issue Bonnie asserts as error is the disallowance of Eiler's opinion that Michael's "regression" was caused by trauma. However, prior to this line of questioning, during the first several pages of Eiler's testimony, Eiler noted that Michael's regression included his exhibiting a "triggered fear response" to a music box, indicative of "some type of trauma." The magistrate allowed the testimony over opposing counsel's objections.

{¶ 71} Accordingly, any resulting error from the disallowance of the subsequent testimony would be harmless.

{¶ 72} Bonnie's next contention is that the magistrate erred by not allowing a recorded recollection into evidence. During Bonnie's testimony, trial counsel handed her documents containing notes that Bonnie had prepared during Michael's lifetime at the approximate time the events had occurred. Opposing

counsel objected because the documents had not been disclosed prior to trial. Bonnie's trial attorney explained that he intended to have them serve as a past recollection recorded in which she could read the documents into evidence. The magistrate ruled that she could keep the documents on her lap and refer to them if her "memory bec[ame] vague." Despite Bonnie's contention that this was a violation of Evid.R. 803(5), we see no error.

{¶ 73}   Evid.R. 803(5) provides that a writing concerning a matter about which a witness once had knowledge but now has insufficient recollection to testify fully and accurately may be read into evidence, assuming that a proper foundation is laid. In laying a proper foundation, the witness must testify that, inter alia, the writing does not refresh his or her independent recollection. Staff Notes, Evid.R. 803(5).

{¶ 74}   In this case, Bonnie was provided with the documents and asked questions to lay a foundation to read them into the record. At no time prior to the magistrate's ruling did Bonnie testify that she could not recall information and needed to refer to the documents to refresh her recollection. Instead, trial counsel explained that he wished to have the written statement admitted as an exhibit and read into the record. The magistrate proceeded to allow parts of the document to be referred to and read into the record when Bonnie was unable to answer the questions herself from her memory. We find that the magistrate did not abuse his discretion in disallowing the reading of the document into the record prior to the laying of a proper foundation.

{¶ 75}   In Bonnie's final contention under this assignment of error, she objects to the following exchange:

{¶ 76}   "Q. Okay. Now, let's—let me move back for a minute to—umm—this—this primary caretaker matter. Umm—This is a—term of art, is it not, that's used by the psychologist in determining issues relating to the welfare of a child, who is the primary caretaker of the child?

{¶ 77}   "A. Yes, it's one of the issues that's considered. Yes.

{¶ 78}   "Q. And there's some people that think it should be the primary issue, are there not, some professionals?

{¶ 79}   "A. I suppose there are.

{¶ 80}   "Q. Have you ever heard of John Bowlby?

{¶ 81}   "A. Yes.

{¶ 82}   "Q. Have you read any of his—any of his works?

{¶ 83}   "A. Yes. My degree's in developmental psychology.

{¶ 84}   "Q. Pardon?

{¶ 85} "A. I said my degree is in developmental psychology. Yes, I've read Dr. Bowlby.

{¶ 86} "Q. Do you agree with Dr. Bowlby and the various things he's written?

{¶ 87} "A. I don't swallow what anybody says. I have read and studied a lot. So, I don't just subscribe to what one person says.

{¶ 88} "Q. Well, would you—would you agree with me that his position would be that it would be extremely damaging to take a child away from a primary caretaker at this age; would you agree with that?

{¶ 89} "A. Yes, that would be his position.

{¶ 90} "Q. So, you wouldn't agree with him on that respect?

{¶ 91} "A. In this particular case, putting all the factors together, I have a very different view and it's based on unique factors in this particular case, not one concept.

{¶ 92} "Q. Do you have any doubt in your mind that—um—if Dr. Bowlby was doing the evaluation he wouldn't agree with you?

{¶ 93} "THE COURT: She doesn't need to answer that question."

{¶ 94} Bonnie claims that the magistrate's disallowance of the testimony resulted in a violation of Evid.R. 706. We disagree.

{¶ 95} On July 1, 1998, Evid.R. 706 became effective, codifying the common-law rule allowing the use of learned treatises for the limited purpose of impeachment. *Freshwater v. Scheidt* (1999), 86 Ohio St.3d 260, 267, 714 N.E.2d 891, fn. 2. Under Evid.R. 706, learned treatises and textbooks are hearsay and, as such, are inadmissible as substantive evidence. Accordingly, the use of statements in treatises or textbooks is limited to purposes of impeachment where the expert either relied on the treatise or textbook in reaching his or her opinion or the treatise is established as reliable authority by admission or testimony of the witness or other expert, or by judicial notice. Evid.R. 706.

{¶ 96} In this case, Dr. Bergman testified that she was familiar with the philosophy of Bowlby. She did not, however, acknowledge Bowlby as a "reliable authority," but instead she explained that Bowlby was not the sole authoritary on the subject matter and that she had used many theories in analyzing the facts of this case. Instead, it seems as though Bonnie was trying to seek introduction of Bowlby's purported opinion through the testimony of Dr. Bergman. We find that Bonnie's attempt at impeaching Dr. Bergman on this point was unsuccessful, as she explained the basis for her views adequately. Accordingly, we find no abuse of discretion in the magistrate's ruling on this testimony.

{¶ 97} We find no merit in Bonnie's fifth assignment of error.

### Bonnie's Sixth Assignment of Error

{¶ 98} "The trial court committed error in finding that Bergman's testimony and report were credible and persuasive when, in fact, Dr. Bergman's report and testimony lacked credibility and were not worthy of belief. Likewise Bergman's conclusion that the child was autistic was unsupportable."

{¶ 99} Bonnie attacks Dr. Bergman's findings that (1) Bonnie engaged in antisocial behavior, and (2) Michael is autistic and has attachment issues.

{¶ 100} The credibility of Dr. Bergman and the weight to be given to her testimony were a matter for the trial court, as the trier of fact, to determine. *State v. DeHass* (1967), 10 Ohio St.2d 230, 39 O.O.2d 366, 227 N.E.2d 212. The trial court agreed with the magistrate that Dr. Bergman's report and recommendations were "credible and persuasive." Dr. Bergman had interviewed all of the parties in the matter and had conducted a thorough report and evaluation of the custody situation. We cannot find that this was an abuse of discretion.

{¶ 101} Furthermore, the trial court's decision to terminate the shared parenting arrangement and award Margaret sole custody of Michael did not rest on Dr. Bergman's evaluation alone. At most, the trial court weighed a portion of Dr. Bergman's report to determine whether it would be detrimental to Michael to be in Margaret's custody.

{¶ 102} Additionally, other evidence exists in the record supporting the trial court's decision that Margaret is a suitable parent and that awarding her sole custody would not be detrimental to Michael. There is evidence in the record that Margaret has been a good mother to Michael. She remarried and has a stable home environment where she can love, support and care for Michael. She has enrolled Michael in school and has appropriately utilized outside resources to address Michael's developmental issues. For these reasons, the trial court did not abuse its discretion in making the determination that, because Margaret is neither unsuitable nor unfit, and because it would not be detrimental to Michael to be placed in Margaret's custody, there was no need to look to a nonparent for custody purposes.

{¶ 103} The trial court was in the best position to conduct such an analysis, and we cannot find anything in the record to suggest that the trial court's review was improper. Accordingly, we overrule Bonnie's sixth assignment of error.

### Bonnie's Seventh Assignment of Error

{¶ 104} "While Appellee's alleged suitability is not a sufficient basis to grant her custody in view of the detrimental [e]ffect on the child, even the trial court's conclusion as to her suitability was erroneous."

{¶ 105}  Bonnie highlights portions of Margaret's testimony and points out inconsistencies and conflicts.

{¶ 106}  We again note that the trial court serves as the trier of fact in a divorce proceeding and must judge the credibility of the witnesses and the weight of the evidence.  *Bussey v. Bussey* (1988), 55 Ohio App.3d 117, 119, 563 N.E.2d 37.  An appellate court may not disturb a trial court's findings of fact where they are supported by competent and credible evidence.  *Seasons Coal Co. v. Cleveland*, 10 Ohio St.3d at 80, 10 OBR 408, 461 N.E.2d 1273.

{¶ 107}  Having reviewed the record, we are unable to say that the trial court committed any error.  The record demonstrates that there was competent and credible evidence to establish that the shared parenting agreement should be terminated and that Margaret should be awarded sole custody of Michael.  Furthermore, the record also demonstrates that the trial court considered all factors in determining Michael's best interests and in its determination that Margaret was a suitable and fit parent.

{¶ 108}  Accordingly, we overrule Bonnie's final assignment of error.  The judgment of the trial court is affirmed.

Judgment affirmed.

BROGAN, J., concurs.

GRADY, J., concurs separately.

GRADY, Judge, concurring separately.

{¶ 109}  I agree that the order from which this appeal was taken should be affirmed, and I do not disagree with Judge Young's reasons for reaching that conclusion.  However, I write separately to express my concern about Bonnie Vance's status in this matter.

{¶ 110}  Shared parenting of Michael was awarded to his parents, Margaret and Joshua Vance, upon their joint application, in their final decree of divorce.  Subsequently, Bonnie Vance, the paternal grandmother, intervened as a third-party defendant, and on the basis of the pleadings she filed the court awarded Bonnie Vance temporary custody of Michael, ex parte.

{¶ 111}  Civ.R. 75(A) states that the Rules of Civil Procedure apply in actions for divorce, "with the modifications or exceptions set forth in this rule."  Intervention by a third party who claims an interest in the matter at issue in a civil action is permitted by Civ.R. 24.  However, Civ.R. 75(B) states that Civ.R. 24 "shall not apply in divorce * * * actions."  Therefore, Bonnie Vance lacked standing to prosecute her claim for custody and temporary custody as an intervenor.

{¶ 112} Had Joshua Vance, the defendant in this divorce action, wished to support his mother's claims, he might have joined Bonnie Vance as a third-party defendant pursuant to Civ.R. 14, subject to the permissive and compulsory joinder provisions of Civ.R. 19 and 19.1. However, Civ.R. 75(B) also states that those rules likewise shall not apply in divorce actions.

{¶ 113} Civ.R. 75(B)(1) through (3) provide three fact-specific grounds for joinder of certain persons in a divorce action. None of those circumstances apply here.

{¶ 114} Judge Young suggests that, nevertheless, Bonnie Vance did have standing to intervene as she did for two reasons. The first is that her allegations related to the child's best interest. The second is that R.C. 3109.04(D)(2) authorizes the domestic relations court to "commit the child to a relative of the child" in lieu of a shared parenting decree "[i]f the court finds * * * that it is in the best interest of the child for neither parent to be designated the residential parent and legal custodian of the child." I do not agree that R.C. 3109.04(D)(2) permits that result when a shared parenting order was previously entered.

{¶ 115} R.C. 3109.04(E)(2)(d) states that when terminating a shared parenting decree that it entered, "the court shall proceed and issue a modified decree for the allocation of parental rights and responsibilities for the care of the children under the standards applicable under divisions (A), (B), and (C) of this section as if no decree for shared parenting had been granted and as if no request for shared parenting had ever been made." Divisions (A), (B) and (C) of R.C. 3109.04 contain no provisions authorizing the court to then commit a child to a relative, as R.C. 3109.04(D)(2) does.

{¶ 116} None of the foregoing rules and statutes confer standing on Bonnie Vance to intervene as she did. None authorized the court to award her temporary custody of Michael. The court might rely on Bonnie Vance's allegations as a basis to terminate shared parenting on the court's own motion, but only if the parents who are parties to the action are given notice and an opportunity to be heard. If faster action is required, the domestic relations court's only alternative is to notify the county's children's service agency, which may then seek a temporary custody order from the juvenile court on verified allegations of abuse or neglect.

{¶ 117} R.C. 3109.04(D)(2) might permit the court to eventually commit a child who was the subject of a terminated shared parenting decree to one of the child's relatives. Realistically, that is unlikely because one or both parents who agreed to shared parenting typically are suitable. More to the point, by limiting the court's commitment alternatives to one of the parents when a shared parenting agreement is terminated, the General Assembly presumably wished to avoid what happened here: intervention by a relative who claims that the child's

best interest is not being served by a shared parenting order to which the parties had agreed.

{¶ 118} These concerns are significant for two reasons. First, R.C. 3109.04 is jurisdictional; it limits the domestic relations court's subject matter jurisdiction to allocate parental rights and responsibilities in and to the circumstances which that section identifies. The power to determine that court's jurisdiction is conferred on the General Assembly by Section 4(B), Article IV of the Ohio Constitution. The court may not expand its jurisdiction outside the statutory bounds which the General Assembly has set.

{¶ 119} Second, and as Judge Young points out, the relief that Bonnie Vance sought violates the precepts of *Troxel v. Granville* (2000), 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49, which generally prohibits equating the rights of a nonparent with the custodial rights of a parent to a result that the parent opposes, absent some finding of unfitness on the parent's part. We applied the rule in *Esch v. Esch* (Feb. 23, 2001), Montgomery App. No. 18494, 2001 WL 173198, to hold that such disputes can't be resolved on a best-interest standard alone. That kind of claim is the claim which Bonnie Vance presented in this instance as a basis to intervene. In *Troxel*, intervention was permitted by statute. Here, no right of intervention exists. Indeed, intervention on this basis is prohibited, and allowing Bonnie Vance to intervene was the genesis of the problem that resulted.

{¶ 120} Perhaps these distinctions and concerns will sink into obscurity, as most separate opinions do. However, and for the guidance of the domestic relations court, which is frequently asked to expand relief beyond the limits of its jurisdiction, I hope that these points may be of use.