[Cite as *King v. Niswonger*, 2014-Ohio-859.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**DARKE COUNTY**

| | | |
|---|---|---|
| MARTY R. KING, et al., | : | |
| | : | |
| Plaintiffs-Appellees | : | Appellate Case No. 2013-CA-1 |
| | : | |
| v. | : | Trial Court Case No. 11-CV-421 |
| | : | |
| SYLVIA G. NISWONGER | : | (Civil Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 7th day of March, 2014.

. . . . . . . . . . .

KEITH FABER, Atty. Reg. #0055354, and GEORGE MOORE, Atty. Reg. #0082391, Faber & Associates, 7706 State Route 703, Celina, Ohio 45822
        Attorney for Plaintiffs-Appellees

STEVEN O. DEAN, Atty. Reg. #0009095, Young & Alexander Co., L.P.A., 130 West Second Street, Suite 1500, Dayton, Ohio 45402
        Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.,

{¶ 1} Sylvia Niswonger appeals the final judgment entered against her in plaintiff-appellee Marty King's action to recover damages he suffered when Niswonger's car

collided with his truck. Finding no error, we affirm.

## I. FACTS

{¶ 2}   On July 25, 2009, King had stopped his Ford Ranger pickup truck on Ohio State Route 49 to make a turn when a car driven by Niswonger rear-ended him. She had been talking on her cell phone. Paramedics from Greenville Township Rescue treated King at the scene and transported him to the Wayne Hospital Emergency Room where he was examined by an emergency-room physician and his cervical, thoracic, and lumbar spine (in lay terms, neck, mid back, and low back) were x-rayed. Based on his examination and the x-rays, the physician concluded that all three areas of King's spine were strained. King was released from the hospital the same day. Two days later, he sought treatment from his long-time chiropractor, Dr. Alex Warner. King received regular treatments from Dr. Warner and later from Dr. Warner's associate, Dr. Kyle Lehman, until February 2010. Six months later, in August 2010, King again began regular treatments.

{¶ 3}   In July 2011, King sued Niswonger for damages—medical expenses, pain and suffering, the detrimental effect of his injuries on his daily activities, and loss of income. Niswonger admitted that she was negligent, and issues of causation and damages were tried to a jury. King presented the testimony of six witnesses. The paramedic who treated King testified about King's complaints at the scene of the accident. Drs. Warner and Lehman gave expert medical testimony about the injuries to King's spine. King's business accountant, Robert Lewis, gave expert testimony about the decline in profits that King's company, King Motors, experienced after the accident. King himself testified about King Motors too. King explained that the company consists mostly of just him. He goes to car auctions where he buys cars and then resells them. King testified that at each auction he must physically inspect numerous cars to decide which ones he

wants to bid on. This requires lots of kneeling, bending, and crawling under cars. King talked about how his neck and back injuries have affected these activities as well as his personal activities. Jared King, King's son, testified also about how his father's injuries have affected his life. King submitted around 45 exhibits supporting his claim for damages. Niswonger did not call any witnesses and submitted two exhibits.

{¶ 4} On King's motion, at the close of all evidence, the trial court directed a verdict for King on three causation issues—whether he incurred past medical expenses, whether he incurred past pain and suffering, and whether the injuries from the accident negatively affected his past daily activities. The court gave the jury an interrogatory that listed eight types of losses and injuries and instructed the jury that it must award something for the three losses on which a verdict had been directed and that it may award an amount for any other loss or injury that it finds King incurred or will incur. The jury awarded King something for each loss and injury listed on the interrogatory. The completed interrogatory looks like this:

| | |
|---|---|
| a. Past Medical Expenses | $5,147.00 |
| b. Past Pain and Suffering | $2,625.00 |
| c. [E]ffect on Past Daily Activities | $1,000.00 |
| d. Past Lost Income, if any | $60,502.00 |
| e. Future Medical Expenses, if any | $21,600.00 |
| f. Future Pain and Suffering, if any | $20,250.00 |
| g. [E]ffect on Future Daily Activities, if any | $5,000.00 |
| h. Future Lost Income, if any | $70,000.00 |
| Total (a + b + c + d + e + f + g + h) | $186,124.00 |

(to be written on General Verdict Form)[1]

{¶ 5}   Niswonger appealed.

## II. ANALYSIS

{¶ 6}   Niswonger presents five assignments of error for our review. The first challenges the admission of some of Robert Lewis's opinions, which Niswonger says were not disclosed to her before trial. The second challenges a limitation that the trial court imposed on Lewis's cross-examination testimony. The third challenges the manifest weight of the evidence supporting the damage award. The fourth challenges the directed verdicts. And the fifth assignment of error challenges the jury interrogatory.

### A. Lewis's "Undisclosed" Opinions

{¶ 7}   Niswonger argues in the first assignment of error that certain of Lewis's expert opinions should have been excluded either because he failed to disclose them during his discovery deposition or because King failed to supplement Lewis's deposition testimony with them. Although the deposition transcript is physically in the record before us, it was not formally made a part of the trial court's proceedings. So we must first determine whether the transcript is part of the appellate record.

### 1. *The deposition transcript*

{¶ 8}   After the trial court entered the final judgment, Niswonger filed a motion, with the deposition transcript attached, asking the court to enter the transcript as a trial exhibit. The court did not rule on the motion, saying that although it may have reviewed the transcript it did not remember doing so. The trial court instead deferred the decision to us to decide in light of the trial transcript.

---

1 *Jury Interrogatory* (Feb. 1, 2013).

{¶ 9}   King contends that the deposition transcript is not properly part of the appellate record. For her part, Niswonger says that she "has not requested th[is] Court to review a deposition that is not part of the record."[2]  She says that the relevant deposition testimony is quoted in the trial transcript. Because we think that the deposition transcript "will assist the Court of Appeals in reviewing the error, if any, in its entirety versus having only snippets of the referenced transcript during conversation of the Court and counsel,"[3] we consider the issue.

{¶ 10} "App.R. 9(E) grants an appellate court the power to conform the record so that material inadvertently omitted is included. The rule is to be construed liberally." *In re Estate of Reeck*, 21 Ohio St.3d 126, 127, 488 N.E.2d 195 (1986). An appellate court may exercise this power sua sponte. *In re Holmes*, 104 Ohio St.3d 664, 2004-Ohio-7109, 821 N.E.2d 568, ¶ 19. Only material that was part of the trial court's proceedings may be added to the record. *Cincinnati Ins. Co. v. Jacob*, 2d Dist. Montgomery No. 25407, 2013-Ohio-2573, ¶ 13. Here, after reviewing the trial transcript, we find that the deposition transcript was a part of the trial court's proceedings. Statements made by the trial court indicate that the court read the transcript at least in part.[4]  Also, we believe that the transcript was inadvertently omitted. At oral arguments, Niswonger's attorney indicated that he mistakenly failed to file it during the trial.

{¶ 11} Because we find that the deposition transcript was before the trial court when it decided whether to admit the objected-to opinions and because we believe that the transcript's omission was inadvertent, we consider the transcript part of the appellate record. *Compare Reeck* at 127 (finding that an insurance policy was before the trial court when it decided the case and

---

2 *Reply Brief of Defendant/Appellant, Sylvia G. Niswonger*
3 Dkt.#43, *Defendant, Sylvia G. Niswonger's, Motion to Enter the Deposition of Robert Lewis as a Court Exhibit.*
4 During the trial, the court made these statements: "In fairness to Mr. Faber [King's attorney], I haven't read the whole deposition, but there was some inquiry about average profits." (Tr. 540); "And in fairness to you [Niswonger's attorney], at page 47 [of the deposition transcript] you did ask if he held any other opinions." (*Id.*); "There was some deposition questioning about average profits." (*Id.* at 612).

finding that the policy's omission was inadvertent, where the trial court had found that the proceeds were paid under the policy and had referred to the policy by number in its judgment entry).

### 2. *The disputed opinions*

{¶ 12} Niswonger contends that either Lewis failed to disclose certain expert opinions during his deposition or King failed to supplement the deposition testimony with them. "[T]he admission or exclusion of evidence is within the sound discretion of the trial court[,] and * * * unless the trial court clearly abused its discretion and a party was materially prejudiced as a result, reviewing courts should be slow to interfere." (Citation omitted.) *Waste Mgt. of Ohio, Inc. v. Mid‑America Tire, Inc.*, 113 Ohio App.3d 529, 533, 681 N.E.2d 492 (2d Dist.1996).

{¶ 13} "The testimony of a party's expert is typically excluded for failure to disclose the subject matter of the expert's testimony where that subject matter is revealed for the first time at trial and the opposing party had no reason to anticipate it." *Fetters v. St. Francis/St. George Hosp., Inc.*, 1st Dist. Hamilton No. C-990410, 2000 WL 282372, *3 (Mar. 17, 2000), citing *Walker v. Holland*, 117 Ohio App.3d 775, 788, 691 N.E.2d 719 (2d Dist.1997). Civ.R. 26(E)(1)(b) provides in part that "[a] party who has responded to a request for discovery * * * is under a duty seasonably to supplement his response with respect to any question directly addressed to * * * the identity of each person expected to be called as an expert witness at trial and the subject matter on which he is expected to testify." "The purpose of this rule is to prevent trial by ambush. If discovery is to serve its purpose, the parties must be entitled, upon the unveiling of a contention, to a reasonable opportunity to prepare to defend against it." *Waste Mgt.* at 533, citing *Shumaker v. Oliver B. Cannon & Sons, Inc.*, 28 Ohio St.3d 367, 371, 540 N.E.2d 44 (1986). "Civ.R. 26(E)(1)(b) does not require a party to give an opposing party notice of every nuance of an expert's opinion." *Id*. Rather,

it "require[s] supplementation of the subject matter on which an expert is expected to testify." (Citation omitted.) *Id.*

{¶ 14} Niswonger challenges the admission of Lewis's opinions on the gross profits of King Motors, his opinions based on comparisons with King Motors's 2011 and 2012 sales data, and his opinions based on the interest rates that King Motors paid to finance its vehicle purchases.

**a. Gross-profit opinions**

{¶ 15} Exhibit 28D ("Marty Wholesale Units Strain-Sprain Period Sept 2009 - March 2010") contains a spreadsheet of the cars that King sold from September 2009 to March 2010. Shown for each car is the amount that King Motors paid for the car, the amount that the car sold for, and the profit (or loss) on the car. The last line of the spreadsheet shows that a total of 119 cars were sold during this period for a gross profit of $65,938. Exhibit 37 ("Marty King Wholesale Car Sales September - March Recovery Period") contains a table with the totals from the last line of Exhibit 28D, and it compares the number of cars sold during this period to the average number of cars sold. The table also shows that, during this period, the gross profit per car was $554.10.

{¶ 16} Niswonger did not object to the admission of Exhibit 28D. But she did object to the admission of Exhibit 37 and to any testimony about gross profit margin or gross profit per vehicle, contending that these calculations were not disclosed to her before trial. But the trial court noted that during Lewis's deposition Niswonger's attorney asked questions about average profits. Ultimately, the trial court concluded that, whether or not there was a discovery violation, Niswonger was not prejudiced. She should have expected testimony on gross profits, said the court, because the issue of average profits is one that could be expected to arise when the plaintiff is seeking lost wages. The court also pointed out that the gross-profit calculations require only basic math skills to complete. We agree with the trial court.

{¶ 17} Niswonger's attorney conceded at trial that "there was some inquiry about average profits" during the deposition. (Tr. 540). Our review of the deposition transcript reveals that Lewis mentioned gross profits numerous times. And he expressly said that, in order to calculate King's lost earnings, he compared gross profits and calculated average gross profit margins. Niswonger could have asked Lewis more about gross profits, but for whatever reason, she didn't. *Compare Savage v. Correlated Health Serv., Ltd.*, 64 Ohio St.3d 42, 44, 591 N.E.2d 1216 (1992) (saying that Appellants could have asked the physician his opinions about Appellee's physical condition during the physician's deposition but did not, and finding no prejudice from the physician's testimony where Appellants were given a document during discovery that indicated the physician's prognosis and described Appellee's condition).

{¶ 18} Moreover, King's pre-trial exhibit list contains documents referring to profits. His preliminary list includes "King Motors, Inc. monthly Profit & Loss Statements" and "King Motors monthly vehicle sales records."[5] A later exhibit list filed by King includes "Wholesale Car Sales Sheets for Marty King for the years 2006, 2007, 2008, 2009, 2010, 2011, and 2012 along with summary pages, data and spreadsheets/charts on the same," which contain a "[l]ist of cars purchased and sold by Marty King from 2006‑2012, including purchase date, purchase prices, and sales prices of each vehicle Marty sold during the time periods, with summary sheet."[6] Also included on this exhibit list are "[g]raphs and charts verifying Marty King and King Motors sales, profits, losses, vehicle purchases/sales from 2006‑2012."[7] These were described as "[d]ocuments, spreadsheets, and data summary charts and graphs depicting various King Motors financial and business data [that] * * * will be used to show the jury the economic impact of the Plaintiff's

---

5 Dkt.#17, *Plaintiffs' Preliminary Disclosure of Exhibits and Witnesses.*
6 Dkt.#33, *Plaintiffs' Witness and Exhibit List.*
7 *Id.*

injuries on the business as well as historical trends."[8]

{¶ 19} Lastly, during opening statements, Niswonger's attorney referred to profits numerous times:

> The Plaintiff would have you believe, ladies and gentleman, that the more cars you buy and sell, the greater your profit is going to be on the cars. But you're going to see throughout the period this is not necessarily true. * * *

> Here are Mr. King's sale sheets for the period of time September of 2008. And you'll see that throughout September of 2008, Mr. King had a total of transactions–September of '08, total cars purchased and sold, 29. Total profit on the cars purchased and sold, minus $5. * * *

> You'll also see evidence, though, that after the period of time that we're going to be dealing with, after July of 2009, yes, Mr. Faber [King's attorney] is correct. There were less cars sold in September of 2009 than there were in September of 2008. In '09, that sheet right there documents total sales of 18 cars. Net profit on the sales, look at the bottom line. The profit on the cars in 2009, 11 less sales, total profit on the month $11,416.

> * * * The amount of cars sold do not necessarily translate into an adverse affect upon the business. In fact, ladies and gentlemen, what you'll see is through the period of time, August of 2008 through December of 2008, total profit on vehicles purchased and sold by Mr. King was $30,149.

> During the same period of time in 2009, August through December, * * * the period of time that Mr. King would have you believe that the profitability of his

---

8 *Id.*

business was going downhill, * * * total profit on vehicles purchased and sold by

Mr. King himself * * *, total profit, $44,975.

(Tr. 154‑155). These statements indicate that Niswonger had to be aware that evidence of gross profits was going to be introduced during the trial.

{¶ 20} Niswonger had every reason to anticipate that Lewis would testify about gross profits. Furthermore, Niswonger could have asked Lewis at his deposition about his gross-profit calculations. Or she easily could have calculated them herself. Under these circumstances we are unable to conclude that the trial court abused its discretion by admitting Lewis's gross-profit opinions.

### b. Opinions based on comparisons with 2011 and 2012 sales data

{¶ 21} Exhibit 36 ("Marty Wholesale Car Sales") contains a graph showing King's car sales in 2006, 2007, 2008, 2009, and 2010, as well as average sales from 2006 to 2010. The graph also shows King's sales in 2011 and 2012. Niswonger did not object to the admission of this exhibit. Yet she objected to those of Lewis's opinions that are based on a comparison of the 2006-2010 average sales and sales in 2011 and 2012, saying that these opinions were never disclosed to her before trial.

{¶ 22} At his deposition, Lewis was asked what he did in preparing his opinions. In his answer, Lewis mentioned that he had summarized the number of vehicles bought and sold from 2006 to 2012 and compared the number sold before the accident with the number sold after. Also, during direct examination at the deposition, Lewis was asked specifically about "the average vehicle sales, particularly in 2006, '07 and '08 compared to 2010, '11 and '12." (Depo. Tr. 52-53). He replied, "'06, '07, and '08 were more than '10, '11, and '12." (Depo. Tr. 53). On recross, Niswonger's attorney did not ask Lewis about these opinions.

{¶ 23} Lewis's opinions based on the sales-data comparisons should not have caught Niswonger by surprise. Lewis said at his deposition that he made comparisons, and Niswonger could have inquired further about these opinions. The trial court did not abuse its discretion by admitting these opinions.

### c. Opinions based on interest rates

{¶ 24} Lewis testified that King Motors financed the vehicles that it bought at auction. For each car bought, said Lewis, King Motors paid interest from the day the car was purchased until the day the car was sold. Lewis said that to calculate lost profits, this interest expense needs to be deducted from gross profit. A table in Exhibit 34 ("Interest Calculations") shows Lewis's interest calculations. The table shows the annual interest rate, monthly interest rate, average vehicle cost, and average amount of interest paid per car in 2009, 2010, 2011, and 2012. Niswonger objected to Lewis's opinions based on the interest rates, saying that this information was not disclosed to her before trial.

{¶ 25} During his deposition, Lewis never mentioned interest rates or the interest expense—nor did Niswonger ask. Whether or not the interest rates should have been disclosed to Niswonger, any error in admitting Lewis's interest-rate opinions was harmless because King himself testified later about the interest rates that his company paid in 2009, 2010, 2011, and 2012. King said that he agreed with the calculations in Exhibit 34 and agreed with Lewis's interest-rate opinions. Niswonger did not object to Exhibit 34 or King's testimony.

{¶ 26} The first assignment of error is overruled.

### B. Limiting Cross Examination of Lewis

{¶ 27} The second assignment of error alleges that the trial court erred by not allowing

Niswonger to ask Lewis about market factors that could have affected car sales. "[T]he trial court has the discretion to limit the scope of cross‑examination." (Citation omitted.) *Vance v. Vance*, 151 Ohio App.3d 391, 2003‑Ohio‑310, 784 N.E.2d 172, ¶ 50 (2d Dist.); *see also State v. Woodard*, 68 Ohio St.3d 70, 74, 623 N.E.2d 75 (1993).

{¶ 28} "Evid.R. 611(B) affords that cross‑examination shall be permitted on all relevant matters and matters affecting credibility." *Id.* Relevant matters concern all relevant facts developed during direct examination. *State v. Maurer*, 15 Ohio St.3d 239, 263, 473 N.E.2d 768 (1984). Relevant matters also include "'all matters pertinent to the case that the party calling the witness would have been entitled or required to raise.'" *State v. Cash*, 193 Ohio App.3d 224, 2011‑Ohio‑1404, 951 N.E.2d 486, ¶ 21 (2d Dist.), quoting *In re Fugate*, 2d Dist. Darke No. 1512, 2000 WL 1370329 (Sept. 22, 2000), citing *Smith v. State*, 125 Ohio St. 137, 180 N.E. 695 (1932), paragraph one of the syllabus.

{¶ 29} The trial court here did not allow Niswonger to ask Lewis about impersonal market factors that may have affected King Motors's sales. The court reasoned that Lewis "is not an economist. He's an accountant analyzing the books. So the limitation is the questions and answers have to pertain to the books not the macro economic perspective or micro economic perspective of the rest of the world." (Tr. 590). The court did, though, allow questions about factors personal to King, saying that "[i]f they have something to do personally with the Plaintiff, I'll give you that because those are the facts of the case. Those aren't the facts of the universe." (*Id*.).

{¶ 30} Niswonger contends that King's attorney opened the door to broader market factors by asking Lewis whether sales would be affected if King were out of town on vacation. But the trial court's limitation allows questions like this, questions about personal factors. King's attorney never asked Lewis about impersonal factors. And King would not have been entitled to ask Lewis

about impersonal, macro economic factors because that was not what Lewis was asked to examine. As Lewis himself said, he was "hired to look at Marty's records and determine whether or not Marty's business sustained a fall‑off in the number of units sold with regard to its sheets," (Tr. 498), and "[t]o express the opinions based on the mathematical analysis and the statistics and the business evaluation associated with the units fall‑off and the trends in business." (*Id*. 499).

{¶ 31} We cannot say that the trial court abused its discretion by limiting cross examination of Lewis.

{¶ 32} The second assignment of error is overruled.

### C. Direction of Verdicts

{¶ 33} The fourth assignment of error alleges that the trial court erred by directing verdicts on three issues of causation–whether King incurred past medical expenses, whether he incurred past pain and suffering, and whether his past daily activities were negatively affected. Directing a verdict on an issue is proper if "the trial court, after construing the evidence most strongly in favor of the party against whom the motion is directed, finds that upon any determinative issue reasonable minds could come to but one conclusion upon the evidence submitted and that conclusion is adverse to such party * * *." Civ.R. 50(A)(4). In evaluating the evidence, a court is not to consider the weight of the evidence or the credibility of the witnesses. *Beatty v. Fultz*, 2d Dist. Montgomery No. 22387, 2008‑Ohio‑5461, ¶ 27.

{¶ 34} The evidence clearly shows that King was injured in the accident. A witness to the accident testified that Niswonger hit King's stopped truck "going at a good rate of speed," (Tr. 175), and that the truck spun around at least 180 degrees, (*id*. at 186). The paramedic who treated King at the scene of the accident testified that King complained to him about low-back pain and

facial numbness. The hospital records show that at the hospital King made similar complaints.[9] And the "impression" of the examining emergency-room physician was "[m]otor vehicle accident with strain of cervical, thoracic and lumbar spine."[10] Finally, all of the medical witnesses–the paramedic, Dr. Warner, and Dr. Lehman–testified that the emergency care that King received at the scene and his transport to and care in the emergency room were reasonable and necessary.

{¶ 35} King was billed for the paramedic's services and for the treatment he received at the hospital. And as we will discuss further in our review of the third assignment of error, testimony from King, his son, and Drs. Warner and Lehman shows that the injuries from the accident caused King pain and suffering and hampered his ability to engage in daily life activities.

{¶ 36} Based on the evidence presented, reasonable minds could conclude only that the accident caused King to incur medical expenses and pain and suffering and hampered his ability to engage in daily life activities. Therefore a directed verdict on these issues is appropriate.

{¶ 37} The fourth assignment of error is overruled.

### D. The Jury Interrogatory

{¶ 38} The fifth assignment of error alleges that the trial court erred by using an interrogatory that lists types of losses and allows the jury to make an award of damages for each one. Niswonger contends that the interrogatory is contrary to R.C. 2315.18 and Ohio Jury Instruction (OJI) 315.01, neither of which, she says, supports an itemized jury interrogatory.

{¶ 39} R.C. 2315.18 states that jury interrogatories in a tort action for damage must specify total compensatory damages, the portion of the total that represents economic loss, and the portion of the total that represents non-economic loss. R.C. 2315.18(D). For each of these categories, OJI

9 Exhibit 13, *Initial Interview*, *Patient Progress Notes*, and *Emergency Room Report*.
10 *Id.*, *Emergency Room Report*.

315.01 provides an appropriate interrogatory. The interrogatory here complies with R.C. 2315.18. It simply breaks down economic and non-economic losses into their constituent parts. Past medical expenses, past lost income, future medical expenses, and future lost income constitute potential economic losses. R.C. 2315.18(A)(2)(a) (defining "economic loss" to include lost compensation) and R.C. 2315.18(A)(2)(b) (defining "economic loss" to include medical expenses). And past pain and suffering, effect on past daily activities, future pain and suffering, and effect on future daily activities constitute potential non-economic losses. R.C. 2315.18(A)(4) (defining "noneconomic loss" to include pain and suffering, mental anguish, and other intangible losses).

{¶ 40} Neither the Revised Code nor OJI prohibits the use of an interrogatory like the one here. And the Ohio Supreme Court approved such an interrogatory in *Fantozzi v. Sandusky Cement Products Co.*, 64 Ohio St.3d 601, 597 N.E.2d 474 (1992). There the Court found no material problem with an interrogatory that allowed the jury to award amounts for past medical expenses, past lost wages, past pain and suffering, past loss of life's enjoyment, future medical expenses, future lost wages, future pain and suffering, and future loss of life's enjoyment. The Court's only quibble was with the overbroad "loss of enjoyment of life" element, which the Court said should be the focused element entitled "inability to perform usual activities." The "effect on daily activities" element here is substantively the same as *Fantozzi*'s "inability to perform usual activities" element.

{¶ 41} Niswonger says that the itemization prejudiced her because it allowed the jury to award damages in overlapping categories, which may have resulted in a double recovery. She has not pointed to any evidence suggesting that this is, in fact, what happened here.

{¶ 42} The fifth assignment of error is overruled.

## E. The Manifest Weight of the Evidence

{¶ 43} Finally, the third assignment of error alleges that most of the jury's damage award is contrary to the manifest weight of the evidence. In reviewing a manifest-weight challenge in a civil case, "'[t]he [reviewing] court * * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983); *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012‑Ohio‑2179, 972 N.E.2d 517, ¶ 17 (saying that the *Thompkins* standard applies in civil cases).

{¶ 44} "Compensatory damages in a personal injury action include compensation for actual medical expenses, future medical expenses, past and future pain and suffering, disability, disfigurement, loss of enjoyment of life, and special damages." *Stephenson v. Upper Valley Family Care, Inc.*, 2d Dist. Miami No. 07CA12, 2008‑Ohio‑2899, ¶ 76, citing *Fantozzi*, 64 Ohio St.3d 601, 597 N.E.2d 474. Compensatory damages also include compensation for the aggravation of an existing injury. *Champ v. Wal‑Mart Stores, Inc.*, 1st Dist. Hamilton No. C‑010283, 2002 WL 440751, *3 (March 22, 2002) ("If a plaintiff suffers an aggravation of an existing injury, the defendant is liable for damages proximately caused by its negligence."), citing *Kantor v. McKinley*, 9 Ohio App.2d 243, 244‑246, 224 N.E.2d 141 (2d Dist.1966) (aggravation of pre‑existing back problem). "It is well‑accepted tort law that even though a plaintiff may have a pre‑existing condition which makes the plaintiff more susceptible to injury, a defendant is liable for whatever aggravations of the condition that result from the defendant's conduct." (Citation

omitted.) *Woodhams v. Moore*, 840 F.Supp. 517, 519‑520 (S.D.Ohio 1994); *see* Keeton, Dobbs, Keeton & Owen, *Prosser and Keeton on the Law of Torts*, 292 (5th Ed.1984); Restatement of the Law 2d, Torts, Section 461.2 (1965).

### 1. *Medical expenses*

{¶ 45} The economic losses that an injured person may recover in a tort action include expenditures for medical care and treatment, rehabilitation services, and other care, treatment, and services incurred as a result of the injury. *See* R.C. 2315.18(A)(2)(b). Here, the jury awarded King past medical expenses of $5,147.08 for the paramedic's services and hospital treatment immediately after the accident and, later, for chiropractic treatments and x-rays.

{¶ 46} Niswonger does not challenge the paramedic or hospital expenses. Nor does she challenge the chiropractic-treatment expenses that King incurred from July 2009 to February 2010. What Niswonger does challenge is the $2,305 in chiropractic-treatment expenses that he incurred from August 2010 to February 2013 and the $1,087 spinal x-ray expense incurred in 2011. She contends that these expenses were not incurred as a result of an injury suffered in the accident but were incurred as a result of preexisting problems.

{¶ 47} King received regular treatments at Warner Chiropractic from July 2009 to February 2010. King was treated initially by Dr. Warner, and later, beginning in the fall of 2009, by Dr. Lehman. During this seven-month period, King complained primarily about pain in his neck, and his diagnosis was a cervical strain/sprain injury. In February 2010, King stopped receiving regular treatments. But six months later, in August, he started again, complaining this time primarily of pain in his low back, and his diagnosis was changed to reflect this. In August 2011, Dr. Lehman ordered new x-rays of King's spine.

{¶ 48} Niswonger points out that King's chiropractic chart does not contain a complaint

regarding his low back before August. But Dr. Lehman testified that he assumed Dr. Warner had found something in King's low back in 2009, soon after the accident, because notes on the chart say that Dr. Warner made adjustments in two different areas of King's low back. Dr. Lehman also testified that when he saw King for the first time in late 2009, King complained mainly about his "neck and mid-back area" but "with some residual low back stuff," for which Dr. Lehman treated him. (Tr. 237). The paramedic, who treated King at the scene, testified that King's "chief complaint, the one that was really bothering him the most, was the back pain." (*Id*. 203). And as we already noted, King complained about low-back pain to the emergency-room physician, who felt tightness there.

{¶ 49} Niswonger also points out that the year before the accident, in February 2008, King had complained about his low back and received treatment from Dr. Warner. Drs. Warner and Lehman both testified that King had no chronic back problems or degenerative back problems before the accident. According to Dr. Lehman, the 2011 x-rays show arthritis in the lumbar spine. While the x-rays done in 2009 also show arthritis there, Drs. Warner and Lehman both testified that, to a reasonable degree of medical certainty, the accident worsened the condition. And the accident caused him to develop chronic post‑traumatic arthritis in his neck (cervical spine). Dr. Warner testified that the speed of deterioration in King's neck and back indicated that trauma, not the normal aging process, caused King's post-accident condition. Dr. Warner testified that but for the accident King's arthritic condition would not be so severe.

{¶ 50} The jury's award for past medical expenses is not contrary to the weight of the evidence.

{¶ 51} The jury awarded King $21,600 in future medical expenses. Drs. Warner and Lehman testified that King's condition is permanent and that in order to maintain his current

lifestyle he requires between 12 and 24 chiropractic treatments each year. Dr. Warner testified that each treatment currently costs $50 and that the cost is expected to increase over time. At the time of trial, King was 52 years old, and according to the U.S. Social Security Administration actuarial life table presented at trial (Exhibit 44), the life expectancy for a 52 year old is 27.32 years. Assuming no increase in the per treatment cost, the jury's award represents roughly 16 treatments each year for the rest of King's expected life.[11] The award for future medical expenses is not contrary to the weight of the evidence.

### 2. *Pain and suffering*

{¶ 52} An award for non-economic loss caused by an injury may include amounts for pain and suffering and any other intangible loss. R.C. 2315.18(A)(4). Here, the jury awarded King $2,625 for past pain and suffering and $20,250 for future pain and suffering. Niswonger contends that the evidence does not support King's entitlement to an award for future pain and suffering. She points out that King testified that by February 2010 he could pretty much do everything he needed to do and that he continued to perform his daily activities.

{¶ 53} Merely because King can do everything he could do before, does not necessarily mean that he does those things without pain and suffering. Indeed, King testified that up to the day of the trial he continued to experience pain in his neck and back and that the pain has "gotten worse." (Tr. 640, 659). Drs. Warner and Lehman both testified that King's condition caused by the accident is permanent.

{¶ 54} Neither the award for past pain and suffering nor the award for future pain and suffering is against the weight of the evidence.

### 3. *Effect on daily activities*

---

11 Sixteen treatments per year multiplied by $50 per treatment multiplied by 27.32 years equals $21,856.

{¶ 55} An award for effect on daily activities relates to the "impairment of one's physical capacity to enjoy the amenities of life." *Fantozzi*, 64 Ohio St.3d 601, 616, 597 N.E.2d 474. It provides "compensation for the deprivation of one's ability to engage in those activities, and perform those functions, which were part of, and provided pleasure to, one's life prior to the injury." *Id*. "Such damages include loss of ability to play golf, dance, bowl, play musical instruments, engage in specific outdoor sports, along with other activities." *Id*. at 617.

{¶ 56} The jury awarded King $1,000 for the negative effect that the injuries had on his past daily activities and $5,000 for their negative effect on his future daily activities. Niswonger contends that the evidence does not support King's entitlement to either award. Here too, she cites King's testimony that by February 2010 he could pretty much do everything he needed to do and that he continued to perform his daily activities.

{¶ 57} King's and his son's testimony support the jury's award for effect on daily activities. King testified that he was unable to take as many trips to Alabama to see his family as he otherwise would have due to his inability to drive long distances because of the pain. He also testified that he was no longer able to play golf or do certain other activities due to the worsening condition of his neck and back. Jared testified that his father continues to experience the effects of his injuries to this day. Jared noticed "differences" in his father's activity level since the accident, that his father "can't do as much as he used to." (Tr. 600). After the accident, Jared said, he often filled in for his father, doing things that King could not, and he continues to help his dad in this way. Lastly, we again note Drs. Warner and Lehman's testimony that King's condition is permanent.

{¶ 58} Neither the award for effect on past daily activities nor the award for effect on future daily activities is against the manifest weight of the evidence.

#### 4. *Lost income*

{¶ 59} Economic loss also includes all wages, salaries, or other compensation lost as a result of an injury to a person that is a subject of a tort action. R.C. 2315.18(A)(2)(a). The jury awarded King $60,502 for past lost income and $70,000 for future lost income.

{¶ 60} Lewis was told to assume that King was in the accident, that he was injured in the accident, and that King "was not able to perform some of his job duties in the same manner he did prior to the collision." (Tr. 501-502). Lewis then looked at King Motors's sales data from 2006 to 2012 and used his "training, knowledge, experience" to see if there were any sales trends. (*Id*. 516). Lewis testified that in each of three post-accident periods–July 2009-February 2010, 2011, and 2012–[12]when compared with their respective historical comparison periods, gross profits declined. Lewis said that the adjusted loss for July 2009 to February 2010 is $26,315.30; for 2011, $35,093.52; and for 2012, $25,023, for a total adjusted loss of $86,431.82. Lewis testified that this amount "fairly represent[s] the amount that [King] could have expected had he reached historical averages." (*Id*. 555).

{¶ 61} Niswonger argues ways of interpreting the data that undermine Lewis's past-lost-income calculation. But the jury "had the opportunity to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the testimony." *State ex rel. Dewine v. Titan Wrecking & Environmental, L.L.C.*, 2d Dist. Montgomery No. 24661, 2012‑Ohio‑1429, ¶ 65, citing *State v. Wilson*, 113 Ohio St.3d 382, 2007‑Ohio‑2202, 865 N.E.2d 1264, ¶ 24. While there may be ways of looking at the data that give different results, we will not reverse the jury's damage finding based solely on the ground that the jury could reasonably have found otherwise. *See id*. ("There was conflicting evidence as to

---

12 For unstated reasons, no loss is claimed for March 2010 to December 2010.

whether the floor tile had become friable, and we will not reverse the trial court's finding on friability based solely on the ground that the trial court could have reasonably found otherwise.").

{¶ 62} Turning to future lost income, Niswonger contends that evidence was not presented that this loss was reasonably certain to occur. She says that Lewis could not make that determination and that jurors had to speculate. The evidence here shows that the effects of King's injuries have caused his company's profits to decline and that those effects will last the rest of King's life. At the time of trial, King was 52 years old. If he works until he is 65, another 13 years, the jury's award works out to about $5,385 per year. Given Lewis's testimony that in 2012 King Motors lost over $25,000, the jury's award is not against the manifest weight of the evidence.

{¶ 63} The third assignment of error is overruled.

### III. CONCLUSION

{¶ 64} We have considered each of the other issues that Niswonger raises in her brief and conclude that they do not constitute reversible error.

{¶ 65} The trial court's judgment is affirmed.

. . . . . . . . . . . . .

DONOVAN and WELBAUM, JJ., concur.

Copies mailed to:

Keith Faber
George Moore
Steven O. Dean
Hon. Jonathan P. Hein