[Cite as *Shaneyfelt v. Byram*, 2020-Ohio-1406.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY**

|  |  |  |
|---|---|---|
| DOUGLAS A. SHANEYFELT | : | |
| | : | Appellate Case No. 2019-CA-9 |
| Plaintiff-Appellee | : | |
| | : | Trial Court Case No. 2018-CV-141 |
| v. | : | |
| | : | (Civil Appeal from |
| ROBERT J. BYRAM, et al. | : | Common Pleas Court) |
| | : | |
| Defendant-Appellant | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 10th day of April, 2020.

. . . . . . . . . . .

KENNETH J. IGNOZZI, Atty. Reg. No. 0055431 and BRIAN M. HAREN, Atty. Reg. No. 0091188, 131 North Ludlow Street, Suite 1400, Dayton, Ohio 45402
    Attorneys for Plaintiff-Appellee

JUDD R. UHL, Atty. Reg. No. 0071370 and PATRICK B. HEALY, Atty. Reg. No. 0083756, 201 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202
    Attorneys for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Robert J. Byram appeals from the trial court's entry sustaining appellee Douglas A. Shaneyfelt's motion for a new trial after a jury verdict for Byram in this personal-injury action.

{¶ 2} Byram advances two assignments of error. First, he contends the trial court erred in finding that his use of demonstrative evidence at trial materially prejudiced Shaneyfelt and necessitated a mistrial. Second, he claims the trial court further erred in barring him from using his accident-reconstruction expert, or anyone from his expert's firm, in future proceedings in this case.

{¶ 3} The record reflects that Shaneyfelt was driving his pick-up truck south on State Route 49 around 11:30 p.m. on March 14, 2017. The rural road was not illuminated, and Shaneyfelt was travelling between 50 and 55 miles per hour on cruise control. At the same time, Byram was backing a tractor-trailer into his driveway on State Route 49. While still at least a quarter of a mile away, Shaneyfelt saw Byram's headlights in the distance. At trial, Shaneyfelt testified that he saw only headlights facing him until he got close to the tractor-trailer. Between 66 and 90 feet away, Shaneyfelt hit his brakes but was unable to stop before striking the side of the tractor-trailer, which was blocking both lanes of travel. Shaneyfelt's most significant injury from the accident was a left shoulder rotator cuff tear. For his part, Byram testified that he could see approximately one mile on the straight, flat road and that he looked for traffic before performing his backing maneuver, which took him just over a minute to perform. The record establishes that it was not unlawful for Byram to back into his driveway and that the tractor-trailer was equipped with all required reflectors, lights, and conspicuity markings, and he had turned on his flashing hazard

lights. Byram also presented evidence that Shaneyfelt's pick-up truck was critically low on brake fluid. Finally, Byram presented evidence that his headlights would not have been shining directly at Shaneyfelt continuously during the backing maneuver, which was almost completed at the time of the accident. Byram testified that his headlights would not have pointed directly at Shaneyfelt for "very long at all." Shaneyfelt's own expert witness agreed that Byram's headlights would have been moving "all over the place" during the backing maneuver.

{¶ 4} After hearing all of the evidence, a jury returned a verdict in favor of Byram. Through interrogatories, the jury found that Shaneyfelt had failed to prove, by the preponderance of the evidence, that negligence by Byram had caused the accident. Despite the fact that the first interrogatory contained instructions that lack of negligence by the defendant made the other interrogatories unnecessary, the jury proceeded. The jury also found that Byram had proven, by the preponderance of the evidence, that negligence by Shaneyfelt had caused the accident. Finally, with regard to potential comparative negligence, the jury found Shaneyfelt 100 percent negligent and Byram zero percent negligent.

{¶ 5} Following the jury's verdict, Shaneyfelt moved for a new trial. He raised two issues. One concerned the trial court's allowing defense counsel to use, as demonstrative evidence at trial, three computer-simulated images purporting to show how Byram's tractor-trailer would have appeared to Shaneyfelt from 600 feet, 400 feet, and 250 feet away. Shaneyfelt argued that the three large blowups had not been timely produced in discovery and that "these alleged demonstrative exhibits of what Mr. Shaneyfelt could see as he approached the area of the intersection, the key issue in the case (discernibility

at night time) were inflammatory, prejudicial, and clearly admitted, over objection, and without basis." (Motion for New Trial at 5.) The other new-trial issue involved defense counsel referencing Shaneyfelt's non-use of a seat belt.

**{¶ 6}** The trial court sustained the new-trial motion based on use of the demonstrative evidence by Byram's accident-reconstruction expert, Ashley Dunn. The trial court reasoned:

> Mr. Dunn prepared three reconstructive diagrams of the crash scene which were eventually presented during trial. The diagram and his testimony purported to put the jury in the position to view the impending collision from Mr. Shaneyfelt's viewpoint at various distances prior to the point of impact. These diagrams were not prepared until after the discovery cut-off date; their existence was only disclosed to Plaintiff on May 17th [four days before trial].

> Clearly, this late disclosure of new material clearly violated the Court's Scheduling Order filed June 26, 2018 which set a deadline of April 12, 2019 for the disclosure of discoverable materials.

> However, as stated by [*King v. Niswonger*, 2d Dist. Darke No. 2013-CA-1, 2014-Ohio-859], violations of deadlines alone are not grounds for exclusion of evidence. Instead, the opposing party must also be "materially prejudiced" by the evidence. When presented with the discovery problem during trial, the Court was compelled to determine whether there was any material prejudice in the diagrams. Aware of the approaching evidentiary conundrum, and before allowing presentment of the exhibits and related

testimony, the Court cautioned the jury that it may hear evidence that might later be stricken. Allowing the testimony and subjecting it to cross-examination was the best way for the Court during trial to determine whether Plaintiff would be materially prejudiced by admission of the exhibits and related testimony.

The Court agrees with the Defendant's citation to *State v. Jones*, 135 Ohio St.3d 10, 984 N.E.2d 948 (2012) which stands for the proposition that demonstrative evidence is admissible if relevant and substantially similar to the object or occurrent [sic] being represented.

In this case, the demonstrative evidence runs afoul of *Jones*. The primary transgression is the misrepresentation of facts by Mr. Dunn when making the diagrams. Specifically, Mr. Dunn failed to measure lumens of the lights on the Defendant's tractor-trailer unit and lumens of the headlights of the Plaintiff's pick up truck. Since lumens measure the amount of light being emitted from a device (aka brightness), and since no measurements were taken, it is impossible for Mr. Dunn to accurately represent the facts of the motor vehicle collision involved herein in those diagrams. His reliance on industry standards and textbook studies may be accepted for a scientific journal, but industry standards and textbook studies are an insufficient basis upon which to express an expert opinion. Similarly, Mr. Dunn's demonstrative evidence was speculative and void of case-specific facts. Allowing such testimony was a material prejudice to Plaintiff.

Counsel for the Defendant took the risk of causing a mistrial by

introducing the demonstrative diagrams and related testimony prepared after the discovery deadline. While this may have been a measured and reasonable risk, for the reasons set forth above, introduction of this evidence necessitates declaration of a mistrial.

* * *

Since the above decision is outcome determinative, the Court finds it unnecessary to determine whether the admission of seatbelt evidence is a valid reason for a new trial. That issue is moot.

* * *

IT IS FURTHER ORDERED AND DECREED that the Defendant is barred from the use of Ashley Dunn and SEA Ltd. in any further part of this proceeding—directly or indirectly—including use of any co-workers and work product. The Court gives notice of its inherent authority to ensure fulfillment of this directive.

(Footnotes omitted.) (Judgment Granting New Trial at 2-4.)

{¶ 7} In his first assignment of error, Byram challenges the trial court's order granting Shaneyfelt a new trial based on Dunn's use of the three demonstrative illustrations. Among other reasons, Civ.R. 59(A) authorizes a new trial "for good cause shown," based on "misconduct of the * * * prevailing party," or "surprise which ordinary prudence could not have guarded against," or due to "[i]rregularity in the proceedings of the court * * * or prevailing party, or any order of the court * * *, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial * * *." "The decision of the trial court whether to grant or deny a motion for a new trial will not be reversed absent an

abuse of discretion." (Citation omitted.) *Miller v. Remusat*, 2d Dist. Miami No. 07-CA-20, 2008-Ohio-2558, ¶ 32. "An abuse of discretion means that the trial court's decision is unreasonable, arbitrary or unconscionable." *Id.*, citing *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 8} Here the trial court found that the three demonstrative exhibits were not created until shortly before trial and were not disclosed to Shaneyfelt's counsel until four days before trial. In fact, Shaneyfelt argued below and asserts on appeal that the demonstrative exhibits provided to his attorney before trial were not even the same ones Dunn showed to the jury. In his argument to the trial court, Shaneyfelt's counsel stated: "I'm looking at Demonstrative Exhibit 1, 2, and 3. And Demonstrative Exhibit 1, 2, and 3 are not even what I was provided with. They are very similar but someone tweaked up— when these things were made bigger, someone tweaked up all the lighting. Someone put on there like a dash in the wipers."[1]   (Tr. at 487-488.) In response, Byram's counsel insisted that he sent the same "PDF" to opposing counsel that he gave to a printing company to produce the illustrations for trial.[2] (*Id.* at 488.) However, that representation is not supported by the record.

{¶ 9} In the record is Plaintiff's Exhibit 29, a copy of an email dated May 17th from

---

[1] We surmise counsel's argument could have been "Someone put on there like a dash *and* the wipers" but we quote the record as it appears.

[2] Accompanying Byram's appellate brief is an affidavit from paralegal Denise Lonneman addressing the alleged discrepancy between the computer-generated images provided to Shaneyfelt's counsel and the blown-up demonstrative images Dunn used at trial. In response, Shaneyfelt argues that the affidavit, which was filed in the trial court on July 1, 2019, should be stricken and ignored because it was not part of the record when the trial court sustained the new-trial motion on June 13, 2019. Upon review, we will allow Lonneman's affidavit to remain part of the record. But we will not consider it in our analysis because it was not part of the record when the trial court decided the new-trial issue.

plaintiff's counsel to Leslie Philpot, apparently a member of counsel's staff, forwarding the images he had received from defense counsel's office to her. Attached are three printed letter-sized color images of the proposed demonstrative exhibits. Plaintiff's Exhibit 29 was not submitted to the jury but was made part of the record by plaintiff's counsel (Tr. 485-488) in support of the plaintiff's counsel argument that the demonstrative exhibits used at trial were not what was supplied pretrial. Without question, the images in Exhibit 29 are not the same as the images used in the 40" by 30" foam board backed demonstrative exhibits that had been allowed at trial. The trial boards are unmistakably different in that the tractor-trailer and its lighting were brighter in the trial boards, and also the images disclosed before trial did not contain superimposed dashboard and windshield wiper shading at the bottom of the images. We recognize that some variation in brightness might be attributable to the brightness settings on either counsel's computers or the brightness setting on the color printer plaintiff's counsel used to produce the Exhibit 29 hard copies of the transmission, but the trial images are definitely brighter. The dashboard and windshield wiper shading in the trial boards, which was absent in the pretrial transmission, convinces us that the pretrial disclosure documents and the trial exhibits were not the same version of the images. We are unable to determine how this discrepancy occurred.

{¶ 10} Regardless of any pretrial discovery violations or differences in what plaintiff's counsel received and what defense expert Dunn showed the jury, the trial court recognized that, for purposes of a new trial, the key question was whether the demonstrative evidence actually used at trial materially prejudiced Shaneyfelt's case. *See, e.g., Evans v. Thobe*, 195 Ohio App.3d 1, 2011-Ohio-3501, 958 N.E.2d 616, ¶ 33

(2d Dist.) ("It is the burden of the party who moves for a new trial to demonstrate the degree of prejudice required."); *Fada v. Info. Sys. & Networks Corp.*, 98 Ohio App.3d 785, 792, 649 N.E.2d 904 (1994) ("The existence of error does not require a disturbance of the judgment unless the error is materially prejudicial to the complaining party. * * * Pursuant to Civ.R. 61, the error must affect the substantial rights of the complaining party or substantial justice must not have been done.").

{¶ 11} As set forth above, the trial court found the demonstrative exhibits prejudicial to Shaneyfelt because Dunn had failed to measure the lumens in Shaneyfelt's headlights or the lights on Byram's tractor-trailer. Due to that omission, the trial court found it "impossible" for Dunn's demonstrative exhibits "to accurately represent the facts of the motor vehicle collision involved herein in those diagrams." Simply put, the trial court reasoned that Dunn had no reliable way of knowing how bright or visible the lights were on Shaneyfelt's pick-up truck or Byram's tractor-trailer. For that reason, the trial court deemed the demonstrative exhibits to be speculative and materially prejudicial to the plaintiff's case.

{¶ 12} Upon review, we accept, arguendo, that the trial court acted within its discretion in deciding that it should not have permitted Dunn to use the three demonstrative illustrations. The trial court's concern about Dunn's lack of inquiry into the brightness of the lights on the parties' vehicles was a reasonable basis for questioning the reliability of the illustrations.[3] If the trial court had excluded them on that basis at trial, we likely would find no abuse of discretion, as the trial court's analysis reflected a sound

---

[3] The trial court did not reference the dashboard and windshield wiper shading that is in the trial boards but not in plaintiff's counsel's file version.

reasoning process. In the context of Shaneyfelt's new-trial motion, however, the issue was whether Dunn's use of the demonstrative exhibits materially prejudiced Shaneyfelt's case, not whether the trial court initially could have excluded them. Based on our review of the record, in our opinion the computer-generated images were not sufficiently prejudicial to warrant granting a new trial, because their exclusion would not have changed the result below. *See Evans* at ¶ 32, quoting *Fada* at 792.

{¶ 13} Defense expert Dunn did not testify that the demonstrative exhibits were actual photographs taken from various distances depicting an actual tractor-trailer backing into a dark driveway on Route 49. He made clear that they were computer-generated images based on crash-scene facts and data he collected through his investigation. In essence, the demonstrative exhibits were visual aids to assist the jury in understanding the defense's theory of the case, which was that Byram was making a lawful maneuver in a tractor-trailer that was marked with legally-required lights and reflective tape and that reasonably should have been seen by Shaneyfelt in time to stop.

{¶ 14} Although Dunn did not measure the lumens in Shaneyfelt's headlights or the lights on the tractor-trailer, Shaneyfelt's attorney was given an opportunity to cross-examine Dunn about the lumens issue. (Tr. at 464-465.) At one point, Shaneyfelt's counsel even asked Dunn to estimate how far Shaneyfelt's headlights were capable of illuminating. Dunn responded: "If they're shining on conspicuity tape, they can put enough light out there to make it reflective and illuminate from as far as 600 feet out." (*Id.* at 475.)

{¶ 15} We note too that Shaneyfelt's own expert witness, Steven Ashton, testified or agreed (1) that Shaneyfelt's headlights should have illuminated at least 288 feet in front of him, (2) that the distance required for Shaneyfelt to stop at the 51 miles-per-hour speed

he was traveling when he applied his brakes was 245 feet, (3) that Byram's headlights would have been moving "all over the place" as he maneuvered the tractor-trailer, not shining directly at Shaneyfelt the entire time, (4) that Shaneyfelt had 17.5 seconds to see the headlights moving "all over the place" before reaching the tractor trailer, and (5) that it would be reasonable for a driver to slow down and discontinue using cruise control upon seeing headlights moving "all over the place." More specifically, the following exchange occurred between defense counsel and Ashton regarding the visibility of Byram's tractor-trailer at the time of the accident:

Q. The conspicuity tape and the reflectors you testified at your deposition were visible from 288 feet; is that correct?

A. I said headlights work at 288 feet. So, yes, they should have been visible from 288 feet depending on the angle.

Q. 288 feet; is that right?

A. Correct.

Q. From someone in Mr. Shaneyfelt's position; is that right?

A. Again, depending on the angle of the trailer.

Q. And the stopping time you just told the jury for someone that's going 51 miles per hour is 237 feet or to 244 feet, correct?

A. 245, yes, sir.

Q. And that's got the human reaction time, the delayed reaction time of a second and a half built into it, right?

A. Right. That's assuming they saw the tape.

Q. And you said it's visible from 288 feet?

A. I said could be.

Q. Okay. So just with those simple calculations if he's going 51 miles per hour and he sees the conspicuity tape and it's visible from 288 feet, based on his speed issue, he should be able to stop in time and avoid the accident, correct?

A. If he saw the conspicuity tape, he could have stopped in enough time.

Q. Okay. But we don't know if the brakes were working, right?

A. Well, clearly they were otherwise we wouldn't have a tire mark on the roadway.

Q. Okay At least one of them was.

A. At least. At least, yes, sir.

* * *

Q. Mr. Shaneyfelt testified at his deposition that he saw the headlights from at least a quarter of a mile away; would you agree?

A. Correct.

Q. Using your calculations, sir, of 51 miles an hourly [sic], did it on my calculator, he would have approximately 17-and-a-half seconds before he reached the point of impact; is that correct?

A. That's correct.

Q. And during that time, those headlights would not have been moving towards him. Fair statement?

A. The headlights were moving in various directions as he's backing

and articulating.

Q. Headlights are moving all over the place, correct?

A. Correct.

Q. Once a driver sees headlights ahead of him from a quarter of a mile away and those headlights are moving all over the place, as an accident reconstructionist, former law enforcement, should that driver then take additional precautions an slow down?

A. Probably, yes.

Q. Should he deactivate the cruise control on his car or his truck if he did have the cruise on?

A. Calls for an opinion. I believe so.

Q. I'm asking you for your opinion. You're the expert.

A. Okay.

Q. And you think at that point he should take the pickup truck off cruise and reduce his speed, correct?

A. Correct.

Q. Because if you see headlights up ahead and those headlights are moving all around, you don't know what's ahead, right?

A. Correct.

(Tr. at 243-244, 250-252.)

{¶ 16} We recognize that Ashton qualified his opinion about the reflective "conspicuity" tape on the tractor-trailer being visible from 288 feet by noting that it depended on the angle of the tractor-trailer. But the record contains evidence regarding

the angle of the tractor-trailer in relation to Shaneyfelt's pick-up truck. When Shaneyfelt struck the tractor-trailer, the parties' vehicles were nearly perpendicular. (*Id.* at 420.) Defense expert Dunn also provided uncontroverted testimony that the conspicuity tape on a tractor-trailer is designed to be visible from an angle of 45 degrees, with maximum visibility at 90 degrees. (*Id.* at 419-420.) In short, the record reflects that Byram was performing a lawful maneuver when he backed his tractor-trailer into his driveway and that backing into the driveway was safer than pulling in forward and blindly backing out onto State Route 49. (*Id.* at 248, 433-434.) The record also contains uncontroverted evidence that the lighting, reflectors, and conspicuity tape on Byram's tractor-trailer were in compliance with the law. (*Id.* at 231, 247, 391-393.)

{¶ 17} The record further establishes that Byram did not pull out immediately in front of Shaneyfelt. We know this for at least two reasons. First, Byram testified that from the time he started his backing maneuver to the time of the accident was a little over one minute. (*Id.* at 308.) If Shaneyfelt was travelling at about 51 miles per hour, as his expert testified, then he was almost a full mile away when Byram began the maneuver. Second, Shaneyfelt himself admitted seeing Byram's headlights when he was still a quarter of a mile away. (*Id.* at 364.) Third, Shaneyfelt's own expert estimated that the pick-up truck would have been 1,320 feet away when Byram began backing up. (*Id.* at 235-236.) In light of the foregoing evidence, we are hard pressed to identify anything Byram did at the time of the accident that was negligent. Without regard to what Shaneyfelt saw, or should have seen, we are unable to identify any action or failure to act on Byram's part that fell below an objective standard of reasonableness. The challenged demonstrative exhibits have no bearing on this determination. They relate to what Shaneyfelt should have been

able to see, not to whether Byram complied with all required lighting regulations or whether Byram's maneuver was negligent to perform.

{¶ 18} As for Shaneyfelt, his own expert testified that the reflective materials on the tractor-trailer should have been visible to Shaneyfelt from 288 feet, depending on the angle, and that Shaneyfelt needed only 245 feet to stop his pick-up truck. As set forth above, the angle of the two vehicles at the time of impact was nearly 90 degrees. Defense expert Dunn provided uncontroverted testimony that the conspicuity tape on Byram's tractor-trailer was visible at a much smaller angle of 45-degrees. Because Byram nearly had completed his maneuver at the time of the accident, the record supports that the angle between the two vehicles had been at greater than 45 degrees for a significant amount of time. But even setting that aside, Shaneyfelt's expert Ashton agreed that Byram's headlights would have been moving "all over the place" when Shaneyfelt admitted seeing them a quarter of a mile away. According to Ashton, that was 17.5 seconds before the accident. Ashton agreed that a driver traveling 51 miles per hour and seeing headlights moving "all over the place" a quarter of a mile up the road reasonably should deactivate cruise control and slow down because "you don't know what's ahead."

{¶ 19} In light of both our inability to identify any negligent act on the part of Byram and testimony from Shaneyfelt's own expert suggesting that Shaneyfelt was negligent, we are firmly convinced that the defense's use of the three demonstratives did not prejudice Shaneyfelt's case or impact the verdict, which included a finding that Byram was zero percent negligent and the unnecessary conclusion that Shaneyfelt was 100 percent negligent. We further disagree with Shaneyfelt's argument that "the key issue in the case [was] (discernibility at night time)." (Motion for New Trial at 5.). Discernibility of

an object on the roadway in front of a driver is an issue related to negligence of that driver, here Shaneyfelt. A motorist violates R.C. 4511.21(A), the assured-clear-distance-ahead statute, if he collides with an object that (1) is ahead in his path of travel, (2) is stationary or moving in the same, (3) did not suddenly appear in his path, and (4) is *reasonably discernible*. *Pond v. Leslein*, 72 Ohio St.3d 50, 52, 647 N.E.2d 477 (emphasis added). A violation of R.C. 4511.21(A) is negligence per se. *Id.* at 53. Discernibility, then, was a question related to whether comparative negligence could be attributed to Shaneyfelt for violation of the assured-clear-distance-ahead statute. If the tractor-trailer was not reasonably discernable, then Shaneyfelt would not have been comparatively negligent. But Byram's negligence was determined by whether he complied with all lighting regulations concerning his tractor-trailer and whether the maneuver he performed was negligent. Therefore, in our view, Shaneyfelt's discernibility argument is misplaced. We hold that any error in the trial court allowing the demonstrative exhibits to be used at trial was harmless with regard to the absence of negligence of Byram, which was dispositive of Shaneyfelt's claim. That being so, the trial court erred in ordering a new trial based on the demonstrative exhibits.

{¶ 20} In the proceedings below, Shaneyfelt also requested a new trial based on defense counsel referring to his non-use of a seat belt. The trial court found this aspect of the motion moot following its ruling on the demonstrative evidence. Although the seatbelt issue no longer is moot, we conclude, on the record before us, that it would be an abuse of discretion to grant a new trial on that basis. We reach this conclusion for multiple reasons. First, Shaneyfelt's own counsel elicited from him the fact that he was not wearing a seatbelt at the time of the accident. (Tr. at 335.) In light of this testimony by

Shaneyfelt on direct examination, we fail to see how he was prejudiced by defense counsel's later mentioning it. Second, and more importantly, the trial court correctly instructed the jury that it could not consider the lack of seatbelt usage as evidence of negligence by Shaneyfelt in the collision. (*Id.* at 541.) Rather, the trial court explained that non-use of a seatbelt was potentially relevant only to the extent of Shaneyfelt's injuries and the damages analysis. (*Id.*) In light of the jury's resolution of the negligence issue, it had no need to reach the issue of damages. Third, Shaneyfelt's non-use of a seatbelt had nothing to do with Byram's actions or whether he was negligent. Therefore, the jury's finding that Byram was zero percent negligent, which was dispositive of the case, could not have been impacted by the seatbelt testimony. For these reasons, we see no conceivable justification for remanding the case to allow the trial court to consider granting a new trial based on the seatbelt issue. Again, granting a new trial on that basis would be a clear abuse of discretion.

{¶ 21} The first assignment of error is sustained.

{¶ 22} In his second assignment of error, Byram contends the trial court erred in barring him from using defense expert Dunn, or anyone from Dunn's firm, in future proceedings in this case. Byram argues that this unexplained ruling by the trial court, which was not requested by Shaneyfelt, appears to be a sanction for Dunn's role in the creation and presentation of the challenged demonstrative exhibits. He argues that the trial court abused its discretion in sua sponte imposing such a sanction. In our analysis above, however, we held that the trial court erred in granting Shaneyfelt a new trial. Given that no new trial or other proceedings will occur, we conclude that Byram's second assignment of error is moot and overrule it on that basis.

**{¶ 23}** Having sustained the first assignment of error, we reverse the trial court's judgment granting Shaneyfelt a new trial and remand the cause for reinstatement of the jury verdict in favor of Byram.

. . . . . . . . . . . . .

DONOVAN, J. and WELBAUM, J., concur.

Copies sent to:

Kenneth J. Ignozzi
Brian M. Haren
Judd R. Uhl
Patrick B. Healy
Hon. Jonathan P. Hein