[Cite as *Marshall v. Colonial Ins. Co.*, 2016-Ohio-8155.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| THOMAS G. MARSHALL AND CHERYL MARSHALL, | ) ) ) | CASE NO. 15 MA 0169 |
| PLAINTIFFS-APPELLANTS, | ) ) | |
| VS. | ) ) | OPINION |
| COLONIAL INSURANCE COMPANY OF CALIFORNIA, individually and/or d.b.a. and/or a.k.a. NATIONWIDE INSURANCE COMPANY, | ) ) ) ) ) | |
| DEFENDANT-APPELLEE. | ) ) | |

CHARACTER OF PROCEEDINGS:     Civil Appeal from the Court of Common
                             Pleas of Mahoning County, Ohio
                             Case No. 09 CV 4477

JUDGMENT:                    Reverse and Remand.

APPEARANCES:

For Plaintiffs-Appellants:       Atty. Angela J. Mikulka
                                 Atty. Thomas L. Mikulka
                                 The Mikulka Law Firm, LLC
                                 134 Westchester Drive
                                 Youngstown, Ohio 44515

For Defendant-Appellee:          Atty. John C. Pfau
                                 Pfau, Pfau & Marando
                                 P.O. Box 9070
                                 Youngstown, Ohio  44513

JUDGES:

Hon. Carol Ann Robb
Hon. Gene Donofrio
Hon. Cheryl L. Waite

                                 Dated:  December 9, 2016

ROBB, J.

{¶1} Plaintiff-Appellant Thomas G. Marshall and his wife, Cheryl, appeal the decision of the Mahoning County Common Pleas Court which granted summary judgment in favor of Defendant-Appellee Colonial Insurance Company of California. Appellant states there is a genuine issue of material fact as to whether Colonial acted with bad faith in handling his underinsured motorist claim. He recovered $50,000 in underinsured motorist benefits after filing suit and then electing to arbitrate his claim as permitted by the policy. Upon viewing the evidence, rational inferences, and doubts in the light most favorable to Appellant, this court concludes that some reasonable mind could find the underinsured motorist claim was denied/delayed without reasonable justification. Appellant's assignment of error is sustained. Summary judgment is reversed, and the case is remanded for further proceedings.

STATEMENT OF THE CASE

{¶2} On July 18, 1997, Appellant was injured in a car accident caused by Anthony Grundy in Trumbull County. He went to the emergency room the next day complaining of neck pain. He was diagnosed with neck sprain and arthritis in the cervical spine. His physician (Dr. Ragheb) noted the accident and reported Appellant's neck "still hurts" at the July 28, 1997 visit.

{¶3} Appellant was seen by a neurosurgeon (Dr. Brocker) in August 1997. An MRI showed significant spinal cord compression due to cervical spondylosis (arthritis). The neurosurgeon recommended a cervical discectomy and fusion; he said there was evidence of spinal cord compression and warned of the risk of myelopathy upon a further trauma.

{¶4} In October and November 1997, Appellant was seen by a physician in the neurology department at Mt. Sinai Medical Center (Dr. Chandar). Dr. Chandar believed Appellant's headaches were the result of anxiety and opined other symptoms were indicative of early spinal cord compression. He said a minor trauma could result in disastrous results, including paralysis. He recommended surgery in the near future.

{¶5}   Appellant continued to complain of neck pain during his visits to Dr. Ragheb in October 1997 and in March, August, and October of 1998.  In May 1998, Appellant was evaluated by another neurosurgeon (Dr. Colombi), who diagnosed degenerative disc disease with disc osteophyte complexes with evidence of cord and root compression.  He noted Appellant complained of neck pain, headaches, and numbness in his hand, which were reported to have been present for a year.  Dr. Colombi performed Appellant's surgery (cervical discectomy, osteophytectomy, and inter body fusion at two levels) on November 6, 1998.  Dr. Colombi's July 1999 "To Whom it May Concern" letter discussed the diagnosis and the surgery and concluded, "The history I have, that is a patient having three motor vehicle accidents and then developing neck and arm pain, it is probable that the symptoms were related to the motor vehicle accident."

{¶6}   As to Appellant's history, Dr. Ragheb's records showed Appellant experienced neck issues after a 1993 car accident.  Physical therapy records said Appellant reported he had neck pain prior to the 1993 accident.  An X-ray from that time showed moderately advanced cervical spondylosis.  Appellant saw Dr. Ragheb 14 months prior to the 1997 accident for neck pain and headaches.  A CT scan was reported as normal.  Before that, Appellant saw a chiropractor for treatment of the neck area.  The history given to Dr. Chandar indicated Appellant had been having intermittent neck pain for 10 years and constant neck pain for the past three years.  The pain was worse after a car accident in 1993 and again after this accident.  (There was also a car accident in 1974, which injured his shoulder and leg).

{¶7}   Appellant had $100,000 in underinsured motorist coverage with Colonial.  He informed Colonial of the accident right after it happened; they closed the file after the tortfeasor accepted liability.  In May 1999, Appellant called Colonial about his medical bills exceeding the tortfeasor's limits at which time a claims adjuster set the reserve in the case at $50,000.  A Colonial representative advised Appellant of an issue with his pre-existing condition, which the company learned from the tortfeasor's liability insurer.  Notwithstanding that knowledge, the tortfeasor's

liability insurer offered its policy limits of $15,000.[1]  Colonial gave consent to settle with the tortfeasor.  Appellant retained an attorney, who contacted Colonial in June 1999.

**{¶8}**  In July 1999, Appellant filed an underinsured motorist claim in the Trumbull County Common Pleas Court against Colonial (and the tortfeasor).  By February 25, 2000, Appellant had provided Colonial evidence that he had incurred over $26,000 in medical bills.

**{¶9}**  In April 2000, a nurse at Colonial reviewed Appellant's medical records.  She advised they should request prior medical treatment notes, depose Appellant, and consider an independent medical examination.  She said it appeared Appellant had significant degenerative changes, including spondylosis, prior to the 1997 car accident.  She also noted the prior car accident in 1993.

**{¶10}** Also in April 2000, Colonial informed Appellant of the Ohio Supreme Court's decision allowing an individual to collect on an underinsured motorist claim from his employer's commercial policy.  *See Scott-Pontzer v. Liberty Mut. Fire Ins. Co.*, 85 Ohio St.3d 660, 710 N.E.2d 1116 (1999).  Colonial noted its policy provided pro-rata coverage.  In order to determine if other insurance applied, Colonial asked Appellant to identify his employer's commercial policy.

**{¶11}** Appellant's deposition was taken in September 2000.  In December 2000, Appellant amended the complaint to add his employer's insurance carrier, Kemper Insurance Company.  The Kemper policy contained $1,000,000 in underinsured motorist coverage.  Kemper filed a declaratory action and sought summary judgment arguing any *Scott-Pontzer* coverage was excess rather than primary.

**{¶12}** In January 2001, Colonial asked Appellant to sign medical releases.  Via an April 2001 letter, Appellant refused to sign broad releases for "any and all" medical history and insisted the releases be limited to records "causally or historically

---

[1] Colonial's claims adjuster testified that setting the reserve involved:  "estimating potential loss exposure as driven by statutory accounting needs for the company as a whole in terms of rate regulation and solvency."  (Hardesty Depo. at 51).  See also (Tucci Depo. at 27).

related" to the injured body part. The releases were revised to Appellant's satisfaction, and subpoenas for medical records were issued in June 2001.

**{¶13}** Both the Colonial and the Kemper policies had an arbitration clause. On May 31, 2001, Appellant demanded arbitration under the Colonial policy; the demand requested verification of Colonial's receipt of the demand and advised that Appellant would await instruction as to how to further proceed in scheduling arbitration. There was no response to this request. A note shows Colonial was "insisting" Appellant was entitled to one arbitration against both insurers, as opposed to one arbitration with each insurer under each policy.

**{¶14}** The Trumbull County case was mediated in June 2001. There was an indication Appellant wanted to recover the policy limits from Colonial ($85,000 after considering the setoff from the tortfeasor). Colonial says it believed a settlement offer would be futile at that time.

**{¶15}** On June 20, 2001, a claims adjuster noted that although there was a clear and prevalent history of neck complaints, Appellant's medical experts have proximately related the surgery to the subject car accident. He noted the medical bills were over $25,000 and the wage loss was $7,000. The reserve was increased to $75,000.

**{¶16}** In November 2001, the Trumbull County Common Pleas Court found Colonial and Kemper would share any liability on a pro-rata basis. As a result, Colonial decreased the reserve to $10,000.

**{¶17}** On November 23, 2001, Appellant sent a letter to Kemper and Colonial about scheduling arbitration since the trial court had ruled any coverage would apply pro-rata. On January 3, 2002, Appellant sent another letter to both insurers, reiterating the demand for immediate arbitration and arguing Kemper's appeal of the trial court's decision did not affect Appellant's right to arbitration.

**{¶18}** On April 18, 2002, Kemper proposed a private agreement wherein Appellant would arbitrate the case with the two insurance companies to establish whether his injuries were proximately caused by the accident, while Kemper could maintain its appeal; the parties would be bound by the arbitrator's award after the

coverage issues were decided in the appellate court (and possibly the Supreme Court). Colonial signed this agreement and returned it to Kemper. There is no indication as to why arbitration did not proceed.

**{¶19}** On June 3, 2002, Appellant issued a demand for settlement to Colonial in the amount of $85,000. This prompted no response from Colonial. A file note shows Colonial was awaiting a decision on the Kemper appeal. Colonial reassigned the claim to a different claims adjuster in October 2002.

**{¶20}** On May 12, 2003, the Eleventh District affirmed the trial court's decision finding *Scott-Pontzer* coverage under the Kemper policy. The court concluded both policies were primary, requiring the insurers to share the costs pro-rata. *Marshall v. Colonial Ins. Co. of California*, 11th Dist. No. 2001-T-0145, 2003-Ohio-2367, ¶ 41-44. Kemper appealed to the Ohio Supreme Court; the appeal was declined, and a motion to reconsider was filed.

**{¶21}** The new claims adjuster reviewed the file in August 2003, noting that no offer would be made until the Supreme Court made a decision. Yet, in answering an interrogatory, Colonial reported it did not delay the claim because of the possible existence of other insurance. (Colonial's Answer to Interrogatory 13).

**{¶22}** On November 5, 2003, the Ohio Supreme Court overruled its *Scott-Pontzer* decision in part, finding an employee is not covered by the employer's policy unless the loss was sustained within the course and scope of employment. *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 217, 2003-Ohio-5849, 797 N.E.2d 1256. Two weeks later, Colonial spoke of dismissing Kemper from the suit. As Kemper was no longer liable, Colonial increased its reserve to $45,000.

**{¶23}** In March 2004, Colonial ordered another internal medical review, asking a company nurse (with a two-year nursing degree) for an opinion as to whether the surgery was the direct result of the accident. The nurse's report was completed in April 2004. She listed as concerns: Appellant had significant degenerative disc disease prior to this accident; he complained of neck pain, headaches, and numbness prior to the accident; 1993 X-rays revealed moderately

severe degenerative changes at the same levels operated on in 1998; and the surgical notes disclosed degenerative osteophytes were causing impingement.

**{¶24}** The nurse said the surgeon indicated that three past car accidents probably contributed to Appellant's condition; she did not believe he indicated the 1997 accident was the reason for the surgery. The nurse concluded the records showed an aggravation of a pre-existing condition. She opined the treatment in 1997 appeared related to the accident, but the treatment beginning in March 1998 appeared related to Appellant's ongoing and pre-existing degenerative condition. She wished to develop questions for Dr. Colombi in order to clarify his position. This was not done.

**{¶25}** On April 29, 2004, Colonial contacted Appellant's counsel, noting that Kemper was no longer part of the case, and asked if a status conference should be canceled in the court case as the matter would be proceeding to binding arbitration. Colonial asked if Appellant had selected an arbitrator and provided Colonial's selection and the town where that arbitrator was located.

**{¶26}** On June 3, 2004, Colonial proffered its first settlement offer of $15,000. Appellant did not respond to the offer. On June 18, 2004, Appellant's counsel said she wanted to complete discovery to prepare for arbitration and asked to take the depositions of the claims adjuster and the claims manager. The depositions of the two Colonial employees were taken in September 2004.

**{¶27}** On January 18, 2005, Appellant provided the name of an arbitrator from Akron, Ohio. Colonial asked to re-depose Appellant. Colonial also asked for the arbitrator's exact address. Colonial's attorney had the address from another source but told Colonial's selected arbitrator not to contact Appellant's arbitrator until he deposed Appellant. Appellant provided the arbitrator's address on June 15, 2005.

**{¶28}** Appellant then asked to depose four more Colonial employees (the prior claims adjuster, the prior claims supervisor, and the two nurses who conducted medical reviews). Colonial denied this request, positing the testimony of these employees was irrelevant to the arbitration case involving what injuries were proximately caused by the accident. In a July 25, 2005 response, Appellant noted

that Colonial re-deposed him. He asserted the right to obtain evidence on the position of a contracting party; he anticipated Colonial would assert positions and defenses at arbitration based upon medical reviews of the two company nurses.

{¶29} Colonial then retained an orthopedic surgeon to review the medical records. Dr. Brodell issued a report on August 9, 2005. He opined the car accident caused soft tissue cervical strain which healed within three months. Arbitration proceeded on November 4, 2005. The arbitrators awarded Appellant $65,000; Colonial was thus obligated to pay Appellant $50,000 in underinsured motorist coverage (due to the setoff of the $15,000 received from the tortfeasor's insurer).

{¶30} On October 13, 2005, Appellant and his wife filed a bad faith action in the Mahoning County Common Pleas Court against Colonial (and/or Colonial dba or aka Nationwide Insurance Company), whose office was located in Canfield, Ohio. The case was voluntarily dismissed and then refiled in November 2009. The complaint stated Appellant was entitled to access his underinsured motorist coverage due to his losses exceeding the limits of the tortfeasor's insurance, a claim Colonial permitted them to settle; it also stated he was entitled to arbitration on the underinsured motorist claim. The complaint provided examples of the alleged bad faith: failing to timely extend a settlement offer; failing to respond to Appellant's demand of settlement for two years; failing to act in good faith leading up to the arbitration; refusing to participate in full discovery by refusing to produce employees for deposition; and, failing to resolve the claim on the basis that other coverage may have existed (in violation of the Ohio Administrative Code).

{¶31} Colonial was permitted to incorporate the filings from the 2005 case, where discovery had been conducted. Colonial filed a motion for summary judgment. Colonial urged the Ohio Administrative Code does not provide a basis for a bad faith claim. Ohio Adm. Code 3901–1–54(B) ("Nothing in this rule shall be construed to create or imply a private cause of action for violation of this rule."). Colonial also pointed out the pertinent portion of the Code states, "*except as otherwise provided by policy provisions,* an insurer shall settle first party claims upon request by the insured

with no consideration given to whether the responsibility for payment should be assumed by others." (Emphasis added). Ohio Adm. Code 3901-1-54(G)(3).[2]

**{¶32}** The Colonial policy contained a pro-rata clause. Colonial valued the claim with the belief there was coverage from the Kemper policy; with pro-rata coverage, its liability would be 10%. Kemper successfully appealed the pro-rata decision. Colonial said it encouraged the arbitration process and made a settlement offer once it was ruled Colonial was solely liable. As to the amount of the offer, Colonial claimed it would have been justified in making no offer. Colonial said it was reasonably justified in believing the surgery was the result of a pre-existing condition and not the proximate result of the accident.

**{¶33}** Colonial also suggested Appellant was unreasonable in failing to negotiate the $15,000 offer, characterizing the arbitrator's award (requiring them to pay $50,000) as being mid-way between Colonial's opening offer of $15,000 and the amount sought by Appellant of $85,000. The motion for summary judgment said Appellant delayed signing medical authorizations and choosing an arbitrator. Appellant's arbitration demand did not name an arbitrator; the policy said in the event of an arbitration demand, "the insured person will select an arbitrator and we will select another." Colonial construed the failure to exercise the choice of an arbitrator within the arbitration demand as an incomplete demand. Colonial noted their correspondence in April 2004 reminded Appellant of the need to select an arbitrator. Appellant did not respond with a selection until January 2005 and did not provide the arbitrator's street address until June 2005.

**{¶34}** Appellant filed a memorandum in opposition to summary judgment, urging the totality of the circumstances surrounding the refusal to pay or delay in payment supported a claim for bad faith. As to Colonial's mention of Appellant's delay in signing the medical release, Appellant urged the refusal to sign overly broad medical authorizations was justified and Colonial's attempt to obtain a broad release was not reasonably justified, citing R.C. 2317.02(B). Appellant said Colonial's refusal

---

[2] Appellant does not maintain an argument concerning the Ohio Administrative Code.

to produce additional employees for deposition in preparation for arbitration was evidence of a lack of good faith and fair dealing in handling the claim.

{¶35} As further evidence of bad faith in handling the claim, Appellant pointed to Colonial's failure to obtain a medical expert until August 2005, just prior to arbitration. Appellant claimed no prior medical evidence supported the determination that the accident was not a proximate cause of the surgery, noting his surgeon related the accident to the surgery. He concluded there was no credible effort to ascertain if the collision proximately caused the need for surgery.

{¶36} Appellant pointed out that Colonial's answer to an interrogatory said the offer was not delayed due to the possible existence of other coverage, but evidence showed it was part of the delay. The policy's pro-rata clause did not mention the ability to delay until other coverage was litigated. Appellant noted it took five months, from January to June of 2004, for Colonial to answer interrogatories. He also urged his expert's opinion provided sufficient reasons to defeat the request for summary judgment. For instance, the expert said to a reasonable degree of professional certainty, there was not good faith and fair dealing; the expert pointed to the reserves that indicate an awareness of the claim value, the failure to obtain a medical expert during most of the time the claim was pending, the value involved when a pre-existing condition was aggravated, and the failure to acknowledge the initial requests for arbitration.

{¶37} Colonial replied it was justified in refusing additional depositions. As to its attempt to gain broad medical authorizations, Colonial said the clause in its policy requiring the insured to provide medical records governed over the statute and was not limited in scope. Although a medical expert was retained to assist the insurer's position at arbitration, Colonial argued it was not necessary to retain a medical examiner to overcome a later bad faith claim because they had the statement of Appellant's physicians reporting degenerative disc disease and past problems. Colonial urged they did not delay processing the claim, positing a pro-rata offer would have been futile due to Appellant's demand at mediation. Colonial concluded

Appellant's presentation of an expert opinion did not preclude summary judgment, asserting various issues with the expert's opinion.

**{¶38}** A magistrate granted summary judgment. *See* Apr. 15, 2015 Mag. Dec. *See also* May 29, 2015 Findings of Fact and Conclusions of Law. Appellant filed objections generally arguing the magistrate failed to construe the evidence in the light most favorable to the non-movant and failed to recognize the expert's affidavit raised a genuine issue for trial. Appellant presented various specific arguments as well, including: medical privilege applied, and the request for records must be reasonable; the handling of a claim was relevant in an underinsured motorist claim (so Colonial's refusal to produce additional employees for depositions was improper); the court is not permitted to weigh the medical evidence; the first settlement offer was untimely; Appellant was justified in not accepting a low offer; and an insurer should respond to arbitration demands.

**{¶39}** On September 4, 2015, the trial court overruled the objections and granted summary judgment. The within appeal followed.

<u>LAW: BAD FAITH & SUMMARY JUDGMENT</u>

**{¶40}** Due to the insurer-insured relationship, an insurer has a duty to act in good faith in the handling and payment of an insured's claim. *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276, 452 N.E.2d 1315 (1983). The breach of this duty will give rise to a cause of action in tort against the insurer: a bad faith claim. *Id.* Mere refusal to pay insurance is not, in itself, conclusive of bad faith. *Id.* at 270.

**{¶41}** An insurer fails to exercise good faith in processing a claim of its insured where the refusal to pay the claim was not based on circumstances that furnish reasonable justification for the refusal. *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 554, 644 N.E.2d 397 (1994) (finding evidence from which the jury could conclude the insurer failed to conduct an adequate investigation on cause of fire and was not reasonably justified in denying the insured's claim). Intent is not an element of the reasonable justification standard. *Id.*, overruling in part *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690, 700, 590 N.E.2d 1228 (1992). The portions of *Said* and other cases which suggested intent was a required element were overruled. "The

reasonable-justification standard set forth in *Zoppo* lessened the standard of proof necessary to show that an insurer acted in bad faith, as proof of actual intent was no longer required." *Wagner v. Midwestern Indem. Co.*, 83 Ohio St.3d 287, 290, 699 N.E.2d 507 (1998).

**{¶42}** The *Zoppo* Court noted the reasonable justification standard was first announced in *Hart*, a decision explicitly "approved and followed" in *Zoppo*. The *Hart* Court explained that where the insurer attempts to justify its conduct by saying it believed there was no liability for the injuries, "such a belief may not be an arbitrary or capricious one." *Hart v. Republic Mut. Ins. Co.*, 152 Ohio St. 185, 188, 87 N.E.2d 347 (1949). *See also Staff Builders, Inc. v. Armstrong*, 37 Ohio St.3d 298, 302, 525 N.E.2d 783 (1988) (also approved by *Zoppo*). In general, an arbitrary and capricious decision is one made without consideration of or regard for facts, circumstances, fixed rules, or procedures. Black's Law Dictionary (10th Ed.2014).

**{¶43}** In other words, the insurer's handling of a claim must be predicated on circumstances that furnish a reasonable justification for the conduct. In discussing whether there is reasonable justification, the Court previously explained: "Where a claim is fairly debatable the insurer is entitled to refuse the claim as long as such refusal is premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim." *Said*, 63 Ohio St.3d at 700. *See also Tokles & Son, Inc. v. Midwestern Indemn. Co.*, 65 Ohio St.3d 621, 630, 605 N.E.2d 936, 943 (1992).[3] This principle would appear to remain intact even after *Zoppo* overruled the portions of these decisions inserting an intent element. *See, e.g., Toman v. State Farm Mut. Auto. Ins. Co.*, 8th Dist. No. 102483, 2015-Ohio-3351, ¶ 33.

**{¶44}** Furthermore, as a bad faith claim can entail the handling and payment of a claim, a refusal to pay a claim is not limited to outright denial of payment; it can

---

[3] These cases also spoke of two types of bad faith claims: (1) where the insurer had no lawful basis for its refusal of the claim or (2) where the insurer failed to determine whether there was a lawful basis for the refusal. *Said*, 63 Ohio St.3d at 700. *See also Tokles*, 65 Ohio St.3d at 630. It has been stated the first type involves the merits of the contract claim. *See Ballard*, 7th Dist. No. 14 MA 85 at ¶

also arise from an insurer's "foot-dragging" in the handling or evaluation of a claim (even if a claim is ultimately paid) or an unreasonably low settlement offer. *Id.* at ¶ 29. "An insurer cannot avoid a bad faith claim simply by establishing that its claims decision was based on the personal opinion of a seasoned adjustor. Rather, the purpose of a bad faith inquiry is to determine whether the adjustor lacked a reasonable justification for that 'personal opinion'." *Id.*

**{¶45}** Civ.R. 56 must be construed in a manner that balances the right of the non-movant to have a jury try claims and defenses that are adequately based in fact with the right of the movant to demonstrate, prior to trial, that the claims and defenses have no factual basis. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 11, citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "Summary judgment is a procedural device to terminate litigation and to avoid a formal trial where there is nothing to try. It must be awarded with caution * * *." *Murphy v. Reynoldsburg*, 65 Ohio St.3d 356, 358-59, 604 N.E.2d 138 (1992).

**{¶46}** Summary judgment can only be granted when there remains no genuine issue of material fact and when reasonable minds can only conclude the moving party is entitled to judgment as a matter of law. Civ.R. 56(C). In determining whether there exists a genuine issue of material fact to be resolved at trial, the court is to consider the evidence and all reasonable inferences to be drawn from the evidence in the light most favorable to the non-movant. *See, e.g.*, *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 11. Doubts are to be resolved in favor of the non-movant. *Leibreich v. A.J. Refrig., Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993).

**{¶47}** The movant has the initial burden to show that no genuine issue of material fact exists. *Byrd*, 110 Ohio St.3d 24 at ¶ 10, citing *Dresher v. Burt*, 75 Ohio St.3d 280, 294, 662 N.E.2d 264 (1996). The non-moving party then has a reciprocal burden. *Id.* The non-movant's response, by affidavit or as otherwise provided in

---

18. Here, Appellant recovered on his contract claim through binding arbitration; receiving $50,000 in underinsured motorist benefits.

Civ.R. 56, must set forth specific facts showing that there is a genuine issue for trial and may not rest upon mere allegations or denials in the pleadings. Civ.R. 56(E).

**{¶48}** "Summary judgment is appropriately granted to the defendant on a claim of bad faith where the record is devoid of any evidence tending to show a lack of good faith on the part of the defendant." *Mentor Chiropractic Ctr., Inc. v. State Farm Fire & Cas. Co.*, 139 Ohio App.3d 407, 411, 744 N.E.2d 207 (11th Dist.2000). If there is evidence from which reasonable minds could differ on whether the insurer lacked good faith in denying coverage or handling the claim, summary judgment cannot be granted. A court "may not weigh the proof or choose among reasonable inferences." *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121, 413 N.E.2d 1187 (1980).

**{¶49}** We consider the propriety of granting summary judgment under a de novo standard of review. *Ohio Govt. Risk Mgt. Plan v. Harrison*, 115 Ohio St.3d 241, 2007-Ohio-4948, 874 N.E.2d 1155, ¶ 5; *Comer v. Risko*, 106 Ohio St.3d 185, 2005-Ohio-4559, 833 N.E.2d 712, ¶ 8. In accordance, we apply the same legal standards binding the trial court. A de novo review is conducted without deference to the lower court's decision. *Dixon v. Conrad*, 7th Dist. No. 04 MA 114, 2005-Ohio-6932, ¶ 35 ("In reviewing an appeal from an award of summary judgment, an appellate court reviews the matter de novo, without deference to the trial court's decision.").[4]

ASSIGNMENT OF ERROR

**{¶50}** Appellants' assignment of error provides:

---

[4] Due to this standard of review, we need not delve into Appellant's argument that the trial court's entry shows flawed reasoning on its face and evidences a weighing of the evidence, which is improper at summary judgment. For instance, the court held the actions of Colonial were reasonably justified. As discussed further infra, the test is not whether the actions were reasonably justified but whether any reasonable person could find they were not reasonably justified (i.e. whether reasonable minds could only find the claims handling reasonably justified). Still, the court's statement was followed by mention of summary judgment standards. In any event, we are reviewing de novo.

Appellant questions why the trial court mentioned an "independent review." *See* Reply Brief at p.5. This was a mere reference to the language in Civ.R. 53(D)(4)(d), which provides: "In ruling on objections, the court shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately applied the law." Appellant also complains there was no mention of his expert's opinion in the entry. He cites nothing requiring the court to detail its ruling on each objection. Even if a request for findings of fact and

"The trial court erred in granting summary judgment to Nationwide as a result of its weighing of the evidence and conclusion that Nationwide's actions were justified."

**{¶51}** Appellant contends his expert's opinion, expressed in an affidavit and at deposition, created a genuine issue of material fact regarding Colonial's handling of his claim. He states where an expert opinion raises a genuine issue of material fact as to the defendant's conduct, a motion for summary judgment must be denied. *Citing Shultzaberger v. Prince & Izant Co.*, 8th Dist. No. 88584, 2007-Ohio-3084, ¶ 13. The *Shultzaberger* case reviewed the expert's opinion in conjunction with other evidence to find a genuine issue of material fact as to an employer intentional tort action. *Id.* at ¶ 23-27. Colonial responds the expert's affidavit did not create a material issue of fact on the bad faith claim.

**{¶52}** Appellant's claims handling expert submitted an affidavit opining to a reasonable degree of professional certainty that the claim was not handled in good faith. He also believed the overall delay was intentional. He noted the original claims adjuster recognized that Appellant's physician indicated a causal relationship between the surgery and the accident; the claim package indicated damages over $26,000 at that time. He said Colonial was aware Appellant's claim had value as the reserve was opened at $50,000 and increased to $75,000. He believed the new claims adjuster retreated from the original position. He chastised her for coming to her own opinion that Appellant would have needed the surgery anyway without having the medical issue reviewed by a licensed physician. Appellant's expert emphasized this claims adjuster admitted at deposition the accident aggravated a prior condition and the surgery resolved the aggravation.

**{¶53}** The expert's affidavit pointed out: Appellant made his first demand for settlement on June 3, 2002; the claims adjuster did not evaluate the claim until March or April 2004; Colonial's offer contained in a June 3, 2004 letter was less than Appellant's medical bills and lost wages; and the offer was made more than four

---

conclusions of law had been filed with the trial court, Civ.R. 52 permits a court to refuse such a request on a summary judgment ruling.

years after the medical bills were submitted (February 2000). The expert said $15,000 was a "minimal" offer and the insurer did not take a realistic view of the overall value of the claim. He added his view that an aggravation of a pre-existing condition has a higher value as the injury tends to be more severe and recovery longer. He mentioned Appellant asked for arbitration in 2001, but arbitration was not conducted until November 2005.

**{¶54}** At deposition, the expert suggested the tortfeasor's payment of his policy limits of $15,000 tends to indicate the other insurer's acceptance of the claim that the surgery was proximately related to the injury. (DeFabio Depo. at 68). He also noted the lack of response to Appellant's 2002 settlement demand and the failure to send a letter explaining the insurer's position on the claim. He criticized the adjuster's reliance on the opinion of a nurse for so many years. He emphasized the claims adjuster's admission that she believed the surgery was the reason the aggravation was resolved, citing to the LeFever Deposition at 47. (DeFabio Depo. at 44).

**{¶55}** In arguing the expert's opinion did not create a genuine issue of material fact, Colonial takes issue with various portions of the affidavit and claims the expert's opinion was factually unfounded. Colonial says the opinion was based on the reserve amount, but the expert did not notice the reserves were decreased to $10,000 in November 2001. (DeFabio Depo at 37-38). However, they were also increased to $45,000 thereafter. Colonial also says the expert admitted at deposition the reserve is a "worst case scenario," but he also said it should be the anticipated probable value of the claim. (DeFabio Depo at 39, 55).

**{¶56}** Colonial complains the expert did not take into account the *Scott-Pontzer* issue and Appellant's voluntary dismissal of Kemper in March 2004. Colonial says the expert was originally looking at the total time from the submission of the medical bills but then admitted at deposition that the pro-rata issue could affect how an insurer evaluates its exposure. (DeFabio Depo at 38). At deposition, the expert said he was not critical of Colonial for taking the position that Kemper had a pro-rata share. (DeFabio Depo. at 44).

**{¶57}** Colonial takes issue with the expert's statement that the insurer disregarded the medical evidence on causation as there was medical evidence Appellant had a prior condition, e.g. the diagnoses involved degenerative disc issues. Colonial complains the expert failed to recognize the insurer's position: the accident caused a soft tissue injury that healed on its own and therefore the surgery was not related to the accident. Colonial complains about the expert's opinion that the insurer should "take the victim as you find him."

**{¶58}** Yet, this appears to be a reference to "well-accepted tort law that even though a plaintiff may have a pre-existing condition which makes the plaintiff more susceptible to injury, a defendant is liable for whatever aggravations of the condition that result from the defendant's conduct." *See, e.g., King v. Niswonger*, 2d Dist. No. 2013-CA-1, 2014-Ohio-859, ¶ 44. The underinsured motorist coverage arises from damages caused by the tortfeasor. The expert explained that in his experience, the insurer often places a higher value on a case involving aggravation of a pre-existing condition; Colonial opines this makes no sense. However, the expert explained such an injury can be more severe and the recovery longer. By way of example, he noted the insurer he worked for had a computer program that took this into account when assigning value to a claim.

**{¶59}** In addition to the expert's opinion and facts mentioned in the expert's affidavit and at deposition, Appellant states the totality of the circumstances raise a jury question as to bad faith. Appellant urges Colonial lacked reasonable justification for attempting to receive broad medical authorizations and refusing to provide employees for deposition. Appellant points to the delay in the adjuster's evaluation of the claim and the delay in providing a settlement offer. Appellant also points to the failure to timely obtain medical evidence contradicting the surgeon's report.

**{¶60}** Colonial separately responds to each of the various circumstances relied upon by Appellant. As to the parties' 2001 dispute over the breadth of requested medical authorizations, Appellant directed Colonial to the privilege statute, which speaks of an exception where a communication to a physician is "related causally or historically to physical or mental injuries that are relevant to issues in the *

* * civil action * * *." R.C. 2317.02(B)(3)(a). There is also the exception where there has been an express waiver of the privilege. R.C. 2317.02(B)(1)(a)(i).

{¶61} Colonial points to the policy language imposing a duty on the insured to cooperate and assist in any matter concerning the claim and a duty to "[a]uthorize [the insurer] to obtain medical and other records and make copies of these records if necessary." Colonial says this places no limit on the scope of the authorization, noting that Appellant's expert said a policy typically requires the insured to give any authorizations "required or requested." (DeFabio Depo. at 71).

{¶62} The first duty, to cooperate and assist, deals with matters "concerning a claim or suit." This invokes a relevancy parameter. The second duty cited ends with "if necessary." Colonial does not specifically claim this phrase only applies to making copies; however, this is essentially what their argument would mean. Appellant's request for reformulated authorizations does not appear unreasonable, especially if there was a prior protest resolved in favor of a release limited to historically and causally related conditions.

{¶63} In any event, the last issue with the medical authorizations was resolved by the parties in the first half of 2001. We are not faced with a question of whether the mere provision of a broad medical release can establish a bad faith claim. We are viewing the totality of the circumstances to ascertain if the insurer's handling of this claim was reasonably justified as a matter of law; reasonable minds could only find the claims processing was performed in good faith.

{¶64} As to Colonial's refusal to make four employees (the prior claims adjuster, the supervisor, and two nurses) available for deposition in July 2005, Colonial distinguishes its prior production of a claims adjuster and a claims supervisor for deposition in September 2004 by noting the court case was still pending at the time of the prior depositions. Nevertheless, the same issue was at play between the parties at both times. Colonial says this was not a breach of contract action as the insurer chose to arbitrate; however, via arbitration, Appellant was still attempting to collect benefits owed under a contract. Appellant urges he had

the right to obtain evidence on the position of a contracting party by deposing its employees.

**{¶65}** Colonial complains Appellant did not seek a ruling on the request from the arbitration panel or a court under R.C. 2711.07.[5] We note the court case was dismissed in favor of arbitration at the time of the latest deposition request. As Appellant responds, seeking a discovery ruling would have delayed the upcoming arbitration.

**{¶66}** Colonial insists the testimony of the personnel involved in handling Appellant's claim was not relevant to the arbitration of the underinsured motorist claim where the issues involved liability for the accident and damages proximately caused by the accident. Discovery does not only encompass admissible evidence but also evidence reasonably calculated to lead to admissible evidence as to the claim or a defense of the claim. Civ.R. 26(B)(1). Colonial suggests Appellant wished to discover information for the future bad faith claim by disguising it as discovery in preparation for arbitration.

**{¶67}** This court has stated: "Although appellants' cause of action only raises a contract dispute and does not allege the separate tort of bad faith handling of the insurance claim, the issue of appellee's good faith or bad faith in denying coverage is certainly related to the subject matter of this action." *Dennis v. State Farm Ins. Co.*, 143 Ohio App.3d 196, 204, 757 N.E.2d 849 (7th Dist.2001) (regarding relevancy of the requested deposition of claims adjuster). Colonial says the claims handling process is not relevant or discoverable in the underinsured motorist proceeding, citing the Supreme Court's *Boone* case. That case dealt with attorney privilege and work product as a response to a request to view a claims file in an underinsured motorist case with an accompanying bad faith claim. *Boone v. Vanliner Ins. Co.*, 91 Ohio St.3d 209, 213, 744 N.E.2d 154 (2001). Attorney privilege and work product were not raised in the case at bar.

---

[5] R.C. 2711.01 provides: "Upon petition approved by the arbitrators, or by a majority of them, the court of common pleas in the county in which such arbitrators, or a majority of them, are sitting may direct the taking of depositions to be used as evidence before the arbitrators, in the same manner and for the same reasons as provided by law for the taking of depositions in suits or proceedings pending in such court."

**{¶68}** Colonial notes that Appellant's expert said the request for additional adjusters' depositions "doesn't have anything to do with the arbitration." (DeFabio Depo. at 72). Yet, the expert also mentioned deposing the adjusters due to their contract knowledge and the need for discovery to see if there is information Appellant does not have. (DeFabio Depo. at 72-73). Plus, the question posed was about adjusters, not necessarily nurses. Two of the employees sought to be deposed were the nurses who conducted the medical reviews. Colonial's reliance on their opinions was disclosed during the deposition of the last claims adjuster. Notably, Colonial's only medical review at the time of the deposition request was performed by these nurses.

**{¶69}** Colonial points to the opinion they eventually obtained from a physician (Dr. Brodell). He noted advanced spondylosis was discovered after a 1993 car accident. After that, Appellant had physical therapy and began seeing a chiropractor. A CT scan in May 1996 was interpreted as "within normal limits." Dr. Brodell said Dr. Colombi operated on the arthritic condition, rather than the symptoms experienced by Appellant from a trauma. He opined Appellant sustained no permanent injury from the accident and his soft tissue injury should have healed in two to three months.

**{¶70}** However, this report was not completed until August of 2005, which was less than three months before the scheduled arbitration and over a year after Colonial issued its first and only settlement offer. Notably, Colonial's position was unsuccessful at arbitration; Dr. Brodell's opinion was not accepted. Appellant concludes one could find Colonial lacked reasonable justification when relying on a nurse's or claims adjuster's construction of the medical records to justify a delay in authorizing a settlement offer, deciding on a settlement offer, and then waiting until August of 2005 to obtain a medical review by a surgeon.

**{¶71}** Colonial urges it was entitled to rely on Appellant's own physicians as a basis to dispute the value of the claim, e.g. whether the accident caused the need for surgery. They point out an independent medical evaluation is not required to avoid a bad faith claim. Colonial notes the statements of the various physicians as to Appellant's degenerative condition. Dr. Colombi's July 6, 1999 letter spoke of the

completed surgery and concluded by stating: "The history I have, that is a patient having 3 motor vehicle accidents and then developing neck and arm pain, it is probable that the symptoms were related to the motor vehicle accident."

**{¶72}** Colonial says this can be read as failing to proximately relate the latest accident to the injury because the final statement did not say which motor vehicle accident of the three mentioned. However, the timing of the letter would suggest he was speaking of the accident prior to the surgery. Nevertheless, in seeking to increase the reserve to $75,000, a prior Colonial claims adjuster believed Appellant's physicians *did* proximately relate the accident to the surgery. (Hardesty Depo. at 53).

**{¶73}** Appellant says, "my doctors told me from the beginning that my surgery was necessitated by this collision." (Interrogatory 15, submitted with Colonial's original Motion for Summary Judgment). Appellant was deposed twice prior to arbitration, although his depositions were not provided here. A claims adjuster noted Appellant testified his seat broke from the force of the rear impact by a drunk driver; his vehicle was pushed forward into another vehicle; he immediately felt pain in his back; his neck pain became worse; and his neck issues after the 1993 accident resolved themselves by the time of the 1997 accident.

**{¶74}** Furthermore, the causation issue was not addressed with Appellant's surgeon or other physicians. This was in spite of the fact that the original nurse reviewer suggested this avenue in April 2000; she advised she would assist in drafting the questions to the surgeon. Additionally, the litigation management strategy proposed by a claim supervisor in September 2000 was to *schedule the deposition of Appellant's surgeon* and then evaluate the case and determine if it could be resolved. This was never done.

**{¶75}** Colonial suggests some of the delay in arbitration was due to Kemper. Colonial also blames the delay on Appellant's 2001 and subsequent arbitration demands did not contain Appellant's choice of an arbitrator, pointing out the policy said the insured was to choose the first arbitrator. Yet, Appellant's original demand asked for verification of Colonial's receipt of the demand and instructions on how to proceed to schedule arbitration. Relying on the lack of an arbitrator's name in those

demands as a basis to ignore the demands is of questionable dealing. It is also noteworthy that, upon receipt of the original demand, a Colonial employee opined in a case note that arbitration was not the preferred method of resolution. Yet, the policy did not permit Colonial to reject the insured's demand.

**{¶76}** Colonial points out a court ruled its potential liability would only be pro-rata with the Kemper coverage (of $1,000,000); Colonial thus believed its liability could not exceed $10,000. Regardless of Colonial's initial anticipation of pro-rata liability, Appellant points to the package of circumstances, including the lack of response to the multiple arbitration demands, the reliance on opinions of company nurses and the failure to obtain a medical opinion by a surgeon during the main decision-making phases of claim processing, the length of time it took for the first settlement offer, the low amount of the only offer, and the failure to amend that offer.

**{¶77}** Colonial says it promptly reevaluated the case once it was determined Kemper would not share pro-rata liability. It sent the file to another company nurse and then offered Appellant $15,000 to settle the case. Colonial blames their failure to offer a higher amount on Appellant's failure to make a counter-offer, claiming they would have responded with a higher offer. In an affidavit, the claims representative who authored the letter containing the offer attested she had hoped to settle the case within her authority of $45,000 and would have proceeded toward that figure. (LeFever Aff. at ¶ 9). Appellant replies this is an admission that its employee offered a "low ball" figure of $15,000 at a point when she was valuing the claim at $45,000. Whether this valuation was realistic is also questioned. The case reserve was opened at $50,000 and increased to $75,000; it was decreased to $10,000 due to a pro-rata ruling, but after that protection was removed, the reserve was raised to $45,000. This figure was set prior to seeking a medical review by a surgeon.

**{¶78}** Notably, even after the claims adjuster was deposed in September 2004, the offer was not increased. As Appellant's expert pointed out, parts of the LeFever Deposition could be seen as negative to Colonial's position. She surmised Appellant was destined for surgery prior to the accident without a medical opinion so stating. She then admitted the accident may have accelerated the need for surgery.

(LeFever Depo. at 48). She agreed the accident aggravated Appellant's pre-existing condition. (LeFever Depo. at 44-45). She also believed the surgery resulted in a resolution of the aggravation of Appellant's neck condition. (LeFever Depo. at 45, 47).

{¶79} There is some evidence showing a failure to ascertain whether the medical position taken by the insurer was supported by medical verification. The length of time between the making of the claim and the retention of a surgical opinion was great, regardless of the other occurrences weighing on the insurer's evaluation. The lack of medical clarification amplifies Appellant's position that the settlement offer was low. Furthermore, the opinion of Appellant's insurance expert is not wholly conclusory or without factual support.

{¶80} Although Colonial presents various good points in support of its position, this court concludes judgment cannot be granted as a matter of law in this case. As to the "fairly debatable" precedent, the case does not merely state: "Where a claim is fairly debatable the insurer is entitled to refuse the claim * * *;" the law continues: "as long as such refusal is premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim." *Motorists Mut. Ins. Co. v. Said*, 63 Ohio St.3d 690, 700, 590 N.E.2d 1228 (1992). A failure to reasonably investigate before arriving at a legal or factual position can give rise to liability. *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 554, 644 N.E.2d 397 (1994) (finding evidence from which the jury could conclude the insurer failed to conduct an adequate investigation on cause of fire and was not reasonably justified in denying the insured's claim).

{¶81} Furthermore, the applicable test for a judge or jury to apply *at trial* is not purely applicable at the summary judgment stage. The ultimate issue *for trial* is whether the insurer's handling of the claim or refusal to pay the claim was done in good faith, meaning whether it was "predicated upon circumstances that furnish reasonable justification therefor." *Zoppo*, 71 Ohio St.3d at 554. At the summary judgment stage, the issue is not whether Colonial proved it handled the claim in good

faith and had reasonable justification for its conduct throughout the handling of its insured's claim.

**{¶82}** If the insured moved for summary judgment, the issue would be whether some reasonable mind could find the insurer did not handle the claim in good faith, i.e. whether some reasonable mind could find the insurer's conduct was not reasonably justified. *See* Civ.R. 56(C). Surely, reasonable minds could find the claim was fairly debatable and the refusal was premised on a genuine dispute over either the status of the law at the time of the denial or the facts giving rise to the claim. However, Appellant was not seeking summary judgment; he was the non-movant.

**{¶83}** Considering the combination of acts and omissions, it cannot be said the record is devoid of any evidence tending to show a lack of good faith. See, e.g., *Mentor Chiropractic Ctr., Inc. v. State Farm Fire & Cas. Co.*, 139 Ohio App.3d 407, 411, 744 N.E.2d 207 (11th Dist.2000) ("Summary judgment is appropriately granted to the defendant on a claim of bad faith where the record is devoid of any evidence tending to show a lack of good faith on the part of the defendant."). Even if certain circumstances would not individually qualify as bad faith conduct, the overall circumstances are relevant and must be viewed in the light most favorable to Appellant.

**{¶84}** Rational inferences must be drawn and doubts must be resolved in Appellant's favor. *See, e.g.*, *Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 11; *Leibreich v. A.J. Refrig., Inc.*, 67 Ohio St.3d 266, 269, 617 N.E.2d 1068 (1993); *Dupler v. Mansfield Journal Co.*, 64 Ohio St.2d 116, 121, 413 N.E.2d 1187 (1980) (a court "may not weigh the proof or choose among reasonable inferences."). Upon doing so, this court concludes some rational trier of fact could find a lack of good faith in some aspects of Colonial's claim handling in this case.

**{¶85}** Appellant's assignment of error is sustained. The entry of summary judgment is reversed, and the case is remanded for further proceedings.


Donofrio, P.J., concurs.

Waite, J., concurs.